Argued and submitted January 4, decision of the Court of Appeals reversed; judgment of the circuit court affirmed in part and reversed in part and case remanded to the circuit court for further proceedings April 7, reconsideration denied May 10, 1994

# ECUMENICAL MINISTRIES OF OREGON,
Victor G. Atiyeh, Robert W. Straub,
Vern Ryles, Walter D. Pelett, and James W. Knapp,
*Petitioners on Review/Respondents on Review,*

*and*

## Clair VANDEHEY,
*Plaintiff,*

*v.*

# OREGON STATE LOTTERY COMMISSION
and James J. Davey, Lottery Director,
*Respondents on Review/Petitioners on Review,*

*and*

# THE OREGON RESTAURANT ASSOCIATION
and Video Lottery Consultants, Inc.,
*Intervenors-Respondents on Review/*
*Petitioners on Review.*

(CC 91C-11532; CA A72455;
SC S40178 (Control), S40463, S40568)

871 P2d 106

552

Rick T. Haselton, Portland, argued the cause for petitioners on review/respondents on review Ecumenical Ministries of Oregon, *et al.* With him on the petition and response was Lindsay, Hart, Neil & Weigler, Portland.

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause and filed a response for respondents on review/petitioners on review Oregon State Lottery Commission, *et al.* Thomas A. Balmer, Deputy Attorney General, Salem, filed the petition. With him on the petition were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Elizabeth S. Harchenko, Special Counsel, Salem.

Jacob Tanzer, of Ball, Janik & Novack, Portland, argued the cause for intervenors-respondents on review/petitioners on review. With him on the petition was Rochelle Lessner.

Henry Kane filed an *amicus curiae* brief *pro se.*

Hardy Myers, of Stoel Rives Boley Jones & Grey, Portland, filed a brief for *amici curiae* Multnomah Kennel Club, Inc., and The New Portland Meadows, Inc.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

GRABER, J.

Fadeley, J., filed an opinion concurring in part and specially concurring in part.

Unis, J., filed an opinion concurring in part and specially concurring in part.

## GRABER, J.

In this case, we are called on to decide the constitutionality of three statutes relating to the operation of the State Lottery — ORS 461.215, 461.217, and 461.546[1] — under the present version of Article XV, section 4, of the Oregon Constitution. As originally adopted in 1857, Article XV, section 4, provided:

> "Lotteries, and the sale of Lottery tickets, for any purpose whatever, are prohibited, and the Legislative Assembly shall prevent the same by penal laws."[2]

In 1976, the voters adopted an amendment, which had been submitted to them by the Legislative Assembly, excepting charitable, fraternal, and religious organizations from the prohibition against lotteries in Article XV, section 4.

In 1984, Article XV, section 4, was amended through the initiative process. As pertinent here, Article XV, section 4, now provides:

> "(3) There is hereby created the State Lottery Commission which shall establish and operate a State Lottery. All proceeds from the State Lottery, including interest, but excluding costs of administration and payment of prizes, shall be used for the purpose of creating jobs and furthering economic development in Oregon.

> "(4)(a) The State Lottery Commission shall be comprised of five members appointed by the Governor and confirmed by the Senate * * *. * * * The Commission is empowered to promulgate rules related to the procedures of the Commission and the operation of the State Lottery. * * *

> "* * * * *

> "(d) The Director [of the State Lottery] shall implement and operate a State Lottery pursuant to the rules, and under the guidance, of the Commission. * * * The State Lottery may operate any game procedure authorized by the Commission, except parimutuel racing, Social games, and the games

---

[1] The text of the challenged statutes is set out in the discussion, *post*, at pp 562-64.

[2] Motions put forward by drafters of the constitution to extend the prohibition against lotteries to "all species of gambling" and to "all games at billiards, ten pins, and cards" failed. Carey, The Oregon Constitution and Proceedings and Debates of the Convention of 1857, 367 (1926). Records of the proceedings do not disclose any mention of the term "casino." *Id.* at 367-68, 481.

commonly known in Oregon as bingo or lotto, whereby prizes are distributed using any existing or future methods among adult persons who have paid for tickets or shares in that game; provided that, in lottery games utilizing computer terminals or other devices, no coins or currency shall ever be dispensed directly to players from such computer terminals or devices.

"(e)   There is hereby created within the General Fund the Oregon State Lottery Fund which is continuously appropriated for the purpose of administering and operating the Commission and the State Lottery. * * * [T]he State Lottery shall operate as a self-supporting revenue-raising agency of state government * * *. The State Lottery shall pay all prizes and all of its expenses out of the revenues it receives from the sale of tickets or shares to the public and turn over the net proceeds therefrom to a fund to be established by the Legislative Assembly from which the Legislative Assembly shall make appropriations for the benefit of the public purpose of creating jobs and furthering economic development in Oregon. At least 84% of the total annual revenues from the sale of all lottery tickets or shares shall be returned to the public in the form of prizes and net revenues benefitting the public purpose.

"'* * * * *

"(7)   The Legislative Assembly has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon."

In 1991, plaintiffs, Ecumenical Ministries of Oregon and various individuals, brought an action for declaratory judgment and injunctive relief against the Oregon State Lottery Commission and the Lottery Director, alleging that ORS 461.215 and 461.217 (providing for the initiation by the Lottery Commission of video lottery games) and 461.546[3] (providing for the distribution of some of the revenues generated by those games) violate certain provisions of Article XV,

---

[3] Although the pleadings in this case purported to challenge ORS 461.546 in its entirety, plaintiffs' arguments pertained only to subsection (1) of that provision. Subsection (2) provides:

"The county shall enter into an intergovernmental agreement with cities in the county for the purpose of providing gaming law enforcement in the cities."

Because ORS 461.546(2) allocates no funds, it does not present any of the issues raised by plaintiffs in relation to subsection (1). We therefore will refer to ORS 461.546(1) and limit our holding in regard to ORS 461.546 to that subsection.

section 4. In particular, plaintiffs alleged that, when implemented, ORS 461.215 and 461.217 will result in the creation of "state-sponsored video poker" that will "have the effect of creating casino gambling in the State of Oregon," in violation of Article XV, section 4(7), of the state constitution. Plaintiffs further alleged that ORS 461.546(1) "mandat[es] the use of net revenues of the Oregon Lottery for purposes other than the constitutionally-mandated purpose of creating jobs and furthering economic development in Oregon" and "authoriz[es] that more than 16% of lottery revenues be expended on costs of administration, including gaming law enforcement," in violation of Article XV, sections 4(3) and 4(4)(e), of the Oregon Constitution.

The Oregon Restaurant Association and Video Lottery Consultants, Inc., intervened in the action. Defendants and intervenors moved for judgment on the pleadings pursuant to ORCP 21 B.[4] Concluding that the case presented "only legal issues to be resolved by the court," that a "motion for judgment on the pleadings is the appropriate procedural device for disposition of the case" and that the statutes do not violate the relevant provisions of the Oregon Constitution, the trial court granted defendants' and intervenors' motion. Plaintiffs appealed.

The Court of Appeals, sitting *in banc*, reversed the decision of the trial court and remanded the case for further proceedings. *Ecumenical Ministries v. Oregon State Lottery Comm.*, 118 Or App 735, 849 P2d 532 (1993). The Court of Appeals held that the terms "casino" and "video poker" are ambiguous and that plaintiffs "are entitled to present evidence" to demonstrate the meaning of those terms and the manner in which "video poker" may violate the constitutional prohibition against "casinos." *Id.* at 740-42. The court also held that plaintiffs "are entitled to present evidence to support their claim that the allocations [mandated] in ORS 461.546 are not for the purpose of creating jobs and furthering economic development in Oregon." *Id.* at 742-43.

---

[4] ORCP 21 B provides:

"After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings."

Rossman, J., joined by Edmonds, J., dissented. Judge Rossman reasoned that "video poker" is authorized by ORS 461.215 and 461.217 and that it is unconstitutional "casino gambling"; he also reasoned that the allocation of funds mandated by ORS 461.546(1) does not promote economic development. *Ecumenical Ministries v. Oregon State Lottery Comm., supra,* 118 Or App at 746-47 (Rossman, J., dissenting). Judge Rossman stated that, "in this straightforward, facial challenge to the statutes," plaintiffs were entitled to judgment on the pleadings. 118 Or at 747.

Intervenors moved for reconsideration, arguing that the case presented questions of law requiring no evidentiary amplification. The Court of Appeals allowed reconsideration and adhered to its former opinion. *Ecumenical Ministries v. Oregon State Lottery Comm.,* 121 Or App 389, 854 P2d 952 (1993).

Plaintiffs sought review in this court on the issue of the constitutionality of ORS 461.546(1). Defendants and intervenors sought review on that issue and on the issue of the constitutionality of ORS 461.215 and 461.217. We allowed review in order to answer those questions of law. We now reverse the decision of the Court of Appeals and affirm in part and reverse in part the judgment of the circuit court.

## METHOD OF RESOLVING A FACIAL CHALLENGE

To determine whether the challenged statutes, on their face, violate Article XV, sections 4(3), 4(4)(e), and 4(7), we must ascertain the meaning of those constitutional provisions and statutes, none of which has been construed by this court. The Court of Appeals held that the meaning of the pertinent constitutional provisions and statutes is not a question of law that can be decided on a motion for judgment on the pleadings. In its original opinion below, the Court of Appeals concluded that there are disputed issues of "material fact," because the term "casino" in Article XV, section 4(7), is ambiguous. *Ecumenical Ministries v. Oregon State Lottery Comm., supra,* 118 Or App at 740-42. Using the same approach, the court held that an evidentiary hearing is required to determine whether the use of lottery revenues for the purposes specified in ORS 461.546 is consistent with

Article XV, sections 4(3) and 4(4). *Id.* at 742-43. On reconsideration, the Court of Appeals adhered to its holding. The court reasoned that "casinos" and "games using video devices" are things "that the trial court and we, as courts, know nothing about and can learn nothing about except from evidentiary presentations." 121 Or App at 393.

■ The Court of Appeals erred in holding that an evidentiary hearing is *required* when analyzing an ambiguous term in the constitution or in a statute. The dispositive issues presented in this facial challenge are issues of law. Granted, in determining the meaning of a term in the constitution, or in analyzing the constitutionality of a law, the court may take judicial notice of certain facts. When a court does so, however, the court is taking judicial notice of legislative facts, which are facts utilized in determining what the law — statutory, decisional, or constitutional — is or should be. *See State v. Clowes*, 310 Or 686, 692 n 7, 801 P2d 789 (1990) (defining and discussing legislative facts); *Chartrand v. Coos Bay Tavern*, 298 Or 689, 693, 696 P2d 513 (1985) ("Legislative facts * * * are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." (internal quotation marks omitted)). Judicial notice of legislative facts is not subject to the Oregon Evidence Code, *State v. Clowes, supra*, 310 Or at 692 n 7, and parties are not entitled as a matter of right to present evidence to demonstrate such facts.[5]

■ Simply put, an ambiguity in the constitution or in a statute does not, by itself, create an issue of fact, let alone one that must be resolved by the presentation of evidence. *Monaghan v. School District No. 1*, 211 Or 360, 315 P2d 797 (1957), illustrates the point. In that case, this court held that provisions of the Oregon Constitution relating to separation of powers forbade a public school teacher from serving in the legislature. To answer the question, the court had to define the constitutional terms "official duties" and "functions." Although the key terms were held to be ambiguous, this court stated:

---

[5] Our ruling should not be understood to mean that it never is appropriate to hold a hearing to receive information to assist the court in identifying the meaning of a term in the constitution or in a statute.

"*There is no issue of fact presented.* Our sole duty * * * is to resolve the dispute in terms of the applicability of one or both of the constitutional provisions relied upon by the school district." *Id.* at 363 (emphasis added).

To resolve the disputed meaning of the constitutional terms, this court considered the language and history of the constitutional provisions, parallel provisions of the Indiana Constitution from which the challenged sections were drawn, secondary treatises, and historical sources. *Id.* at 364-73.

■■ This court's more recent cases establish an orderly method of analyzing ambiguous terms in constitutional provisions adopted through the initiative process and in statutes. With respect to initiated constitutional provisions, this court has held:

"In interpreting a constitutional provision adopted through the initiative process, our task is to discern the intent of the voters. The best evidence of the voters' intent is the text of the provision itself.[6] The context of the language of the ballot measure may also be considered; however, if the intent is clear based on the text and context of the constitutional provision, the court does not look further."

*Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993) (citations and footnotes omitted). The context of a constitutional provision adopted through the initiative process includes related ballot measures submitted to the voters at the same election. *Cf. O'Mara v. Douglas County*, 318 Or 72, 76 n 1, 862 P2d 499 (1993) (considering, as part of the context of a legislative enactment, a related provision enacted as part of the same act). If the intent of the voters is not clear from the text and context of the initiated constitutional provision,[7] the court turns to the history of the provision.[8]

---

[6] *See also King v. City of Portland*, 2 Or 146, 154-55 (1865) ("If, when our Constitution was made, certain words or sentences had obtained a certain signification or force, either by common usage or legal decision, it must be presumed, if found in that instrument[,] that they bear that established meaning, unless plainly from the context or other provision, a different meaning is certainly intended.").

[7] This court has noted that caution is required in ending the analysis before considering the history of an initiated constitutional provision. "In practice, * * * courts rarely see disputes over interpretation when the opposing party cannot show a possible alternative reading of the words, which it claims to be correct in context." *Lipscomb v. State Bd. of Higher Ed.*, 305 Or 472, 485, 753 P2d 939 (1988). In addition, *Lipscomb* points out the importance of considering the history of an

■    This court applies to the construction of a statute the same method of analysis, described above, that it applies to the construction of an initiated constitutional provision. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993); *Roseburg School Dist. v. City of Roseburg, supra*, 316 Or at 378 n 4, 379 n 5. That is, the first level of analysis is to examine text and context. That level includes subsidiary principles of statutory construction that are relevant to this case. In determining the meaning of the text of a statute, words of common usage that are not defined in the statute typically are to be given their plain, natural, and ordinary meaning. *PGE v. Bureau of Labor and Industries, supra*, 317 Or at 611. And, the context of a statutory provision includes other provisions of the same statute and other statutes on the same subject. *Ibid*. Only if the legislative intent remains unclear after an examination of text and context does the court consider legislative history.

## "CASINOS"

### A.  *Meaning of Article XV, Section 4(7)*

■    We first consider the meaning of Article XV, section 4(7), of the Oregon Constitution, which is the subject of plaintiffs' first claim for relief. In particular, we consider the meaning of the term "casinos," as used in that section. The text of Article XV, section 4(7), does not define the term "casino" or otherwise disclose to us the intent of the voters in prohibiting the operation of casinos in this state. Neither does any other provision of the constitution define "casinos."

The ordinary meaning of the noun "casino" is a "building or room used for social meetings and public amusements * * * *specif*: a building or room for gambling." Webster's

---

initiated constitutional provision when the provision deals with essential aspects of governmental authority. *Id.* at 484-85.

[8] In considering the history of a constitutional provision adopted through the initiative process, this court examines, as legislative facts, other sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure. Such information includes the ballot title and arguments for and against the measure included in the voters' pamphlet, and contemporaneous news reports and editorial comment on the measure. *See State v. Wagner*, 305 Or 115, 131-34, 752 P2d 1136 (1988) (examining those items in determining the meaning of a constitutional amendment adopted through the initiative process).

Third New International Dictionary 347 (1976). The noun "gambling" is defined as "the act or practice of betting: the act of playing a game and consciously risking money or other stakes on its outcome." Webster's Third New International Dictionary 932 (1976). Those definitions suggest only that a "casino" is a physical structure "for gambling." It seems doubtful that voters intended so literal and sweeping a meaning, however. If the meaning were that broad, a place such as a citizen's game room where friends play poker for pennies would be prohibited from operating, even though it had not been prohibited under the earlier versions of Article XV, section 4, since statehood.

We turn for further assistance to the context of Article XV, section 4(7). Other provisions of Article XV that were adopted at the same time as section 4(7) are part of that context. Sections 4(3), 4(4), 4(5), and 4(6) of Article XV provide in some detail for the establishment and operation of a state lottery, including the operation of *"any game procedure* authorized by the Commission," with certain exceptions not relevant here, and the operation of "lottery games *utilizing computer terminals."* Or Const, Art XV, § 4(4)(d) (emphasis added).

Section 4(4)(d) also provides in part that, in lottery games utilizing computer terminals or other devices, "no coins or currency shall ever be dispensed directly to players from such computer terminals or devices." That directive suggests that the voters were not opposed to games using computer terminals, but had a more limited intent to prevent the use of lottery devices having the cash- or currency-dispensing features of so-called "slot machines."

By comparison, section 4(7) provides that the Legislative Assembly shall not authorize, and shall prohibit, "casinos" from operating in Oregon. The context described above suggests that the voters intended to distinguish between the authorized State Lottery and particular types of game procedures (expressly including game procedures utilizing computer terminals), on the one hand, and the general category of gambling establishments known as "casinos," on the other. That is, when the voters voted to prohibit "casinos," they did not intend to prohibit the State Lottery from operating game procedures using computer terminals.

The 1984 amendments to Article XV, section 4, were presented to the voters at the general election in that year as Ballot Measure 4. 1984 Ballot Measure 5 was the companion measure to Measure 4 and was adopted by the voters at the same election as was the latter. Measure 5 therefore also constitutes part of the context of Measure 4. We turn to an examination of Measure 5.

Measure 5 contained statutory provisions for the regulation of a state lottery, should one be authorized by the passage of Measure 4. The text of that measure neither defined nor referred to "casinos." Some portions of the text nevertheless assist us in determining the meaning of that term.

Section 4(2)(d) of Measure 5 repeated the following injunction from Measure 4:

> "In games utilizing computer terminals or other devices, no coins or currency shall be dispensed directly to players from such computer terminals or devices."

Section 5(2) of Measure 5 provided in part:

> "No person shall be a Lottery Game Retailer who is engaged exclusively in the business of selling Lottery tickets or shares."

The quoted provisions of Measure 5 suggest that the voters intended to prevent the use of lottery devices directly dispensing coins or currency and that they intended to prevent the establishment of enterprises "engaged exclusively" in lottery-related activities.

Considering all of the foregoing text and context, we conclude that, in adopting Article XV, section 4(7), prohibiting the operation of "casinos," the voters intended to prohibit the operation of establishments whose dominant use or dominant purpose, or both, is for gambling. The voters did not intend, in adopting Article XV, section 4(7), to prohibit the use of lottery games using computer terminals, with the exception of those that dispense coins or currency directly to players.

B. *Constitutionality of ORS 461.215 and 461.217*

Having thus interpreted Article XV, section 4(7), we next consider whether ORS 461.215 and 461.217 violate that constitutional provision. ORS 461.215 provides in part:

"(1) The Oregon State Lottery Commission may initiate a game or games using video devices * * *."

ORS 461.217 provides in part:

"(1) A video lottery game terminal that offers a video lottery game authorized by the Director of the Oregon State Lottery shall be placed for operation only on the premises of an establishment that has a contract with the state lottery as a video lottery game retailer. The terminal must be within the control of an employee of the video lottery game retailer. It shall not be placed in any other business or location.

"(2) A video lottery game terminal shall be placed only on the premises of an establishment licensed by the Oregon Liquor Control Commission [OLCC] with a Class "A" dispenser, Class "B" dispenser, Retail Malt Beverage, Restaurant or Seasonal dispenser license. A video lottery game terminal shall be placed only in that part of the premises that is restricted to minors and that is used primarily for the consumption of alcoholic beverages.

"(3) No more than five video lottery machines shall be placed in or on premises described in subsection (2) of this section."

In order to understand what ORS 461.215 and 461.217 mean, we also examine the statutes governing the issuance by the OLCC of the licenses enumerated in 461.217. Class "A" and Class "B" dispenser licenses are governed by ORS 472.110(1), which provides:

"A dispenser's license may be issued to private clubs, fraternal organizations, veterans' organizations, railroad corporations operating interstate trains and commercial establishments where food is cooked and served, and shall be designated as Class 'A,' Class 'B,' and Class 'C.' "

Retail malt beverage licenses are governed by ORS 471.265 and permit persons "operating a place of business where refreshments are served, to sell malt beverages * * *, hard cider * * * and wine." Such establishments also may allow dancing, singing, and "other proper forms of entertainment upon the licensed premises." Restaurant licenses are governed by ORS 471.250; restaurant licensees also may allow "any proper form of entertainment." Seasonal licenses are governed by ORS 472.205; such licenses are issued to establishments where food is cooked and served and permit

the licensee to allow "dancing and other proper forms of entertainment upon the licensed premises."

We conclude that ORS 461.215 and 461.217, when considered in the context of limitations imposed by other applicable provisions of ORS chapters 461, 471, and 472, are consistent with the prohibition in Article XV, section 4(7), on "casinos," as we have interpreted that prohibition. The use of video lottery game terminals does not, *per se*, make a place a casino. Because ORS 461.215 and 461.217 prohibit the use of more than five video lottery game terminals in any one location and are subject to other provisions regarding the types of establishments in which such terminals may be located, those statutes are consistent with the constitutional prohibition against establishments whose dominant use or dominant purpose, or both, is for gambling.

It may be that some establishments in which video lottery game terminals are located are casinos within the meaning of Article XV, section 4(7), notwithstanding the limited number of terminals in each establishment and the requirement that the establishment be licensed to engage in a business other than the business of gambling. That kind of factual, as-applied inquiry is beyond the scope of or inquiry in this case, however. In response to this facial challenge, our task is only to determine whether ORS 461.215 and 461.217, on their face, are in harmony with Article XV, section 4(7). The presence of five video lottery game terminals in one place does not, in all circumstances, demonstrate that gambling is the dominant use or dominant purpose, or both, of the establishment.

We hold that ORS 461.215 and ORS 461.217, on their face, do not violate Article XV, section 4(7), of the Oregon Constitution.

## "COSTS OF ADMINISTRATION"

ORS 461.546(1) provides:

"An amount equal to six percent of the net revenue of video lottery games in the county shall be distributed to the county as administrative expenses to be expended as follows:

"(a)  Three percent for gaming law enforcement; and

"(b)  Three percent for community mental health pro-grams to treat gambling addiction."

Plaintiffs argue that the expenditures provided for in that statute do not create jobs and promote economic develop-ment, as required by Article XV, sections 4(3) and 4(4)(e). Defendants counter that economic development is a broad term that encompasses the expenditures provided for in ORS 461.546(1).

It is unnecessary to reach those arguments. ORS 461.546(1) designates the expenditures *as administrative expenses*.[9] Under Article XV, section 4(4)(e), administrative expenses (the nature of which we discuss below) may not exceed 16 percent of lottery revenues. The legislature has specified in ORS 461.546(1) that the expenditures are "dis-tributed * * * as administrative expenses," that is, that they are to be taken from the administrative expense portion of lottery revenues, rather than from the portion (84 percent or more) devoted to paying prizes and to creating jobs and furthering economic development.

Intervenors pertinently argue in this court that the expenditures authorized by ORS 461.546(1) are permissible costs of administration. We turn to that argument.

A.  *Meaning of Article XV, Sections 4(3) and 4(4)(e)*

The text of Article XV, sections 4(3) and 4(4)(e), does not define the terms "costs of administration" or "adminis-tering and operating." Neither does any other provision of Article XV define those terms.

Part of Article XV, section 4(4)(e), suggests, how-ever, that the voters had in mind the costs associated with the internal procedures necessary to operate the State Lottery. Section 4(4)(e) requires the State Lottery to operate as a self-supporting and revenue-raising agency, which must pay "all

---

[9] *See also* ORS 461.548, which provides:

"Notwithstanding any other provision of law, the Oregon State Lottery Commission shall meet the constitutional requirements for prizes and adminis-trative costs separately for video and all other lottery games. The lottery commission shall not intermingle the results of video lottery games for the purpose of calculating the allowable limit on administrative expenses of other lottery games."

of *its* expenses" out of the revenues that it receives. (Emphasis added.)

The usual meaning of the words used in Article XV, section 4(3) and 4(4)(e) conveys a similar message. The ordinary meaning of the noun "administration" is "an act of administering." Webster's Third New International Dictionary 28 (1976). The verb "administer" is defined as "to manage the affairs of"; "to direct or superintend the execution, use, or conduct of." *Id.* at 27. Those definitions suggest that costs of administration are costs related to the management or implementation of the State Lottery.

In addition to considering the text of Ballot Measure 4, we examine its context, including its companion measure, 1984 Ballot Measure 5. Section 7 of Ballot Measure 5 stated in part:

"(1)   All money payable to the Commission shall be deposited in an account within the General Fund known as the State Lottery Fund. * * * The State Lottery Fund is continuously appropriated for the purpose of *administering and operating* the Commission and the State Lottery.

"(2)   Disbursements shall be made from the State Lottery Fund for any of the following purposes:

"(a)   The payment of prizes * * *;

"(b)   *Expenses of the Commission and the State Lottery*;

"(c)   Repayment of any funds advanced from the temporary loan for initial start-up costs * * *;

"(d)   Transfer of funds from the State Lottery Fund to the benefit of the public purpose described in Section 4, Article XV of the Constitution.

"* * * * *

"(4)   *Expenses of the State Lottery shall include all costs incurred in the operation and administration of the State Lottery and all costs resulting from any contracts entered into for the purchase or lease of goods or services required by the Commission, including but not limited to,* the costs of supplies, materials, tickets, independent audit services, independent studies, data transmission, advertising, promotion, incentives, public relations, communications, compensation paid to Lottery Game Retailers, bonding for Lottery Game Retailers, printing, distribution of tickets and shares, reimbursing other governmental entities for services provided to

the State Lottery, and for *any other goods and services necessary for effectuating the purposes of this Act.* No more than sixteen percent (16%) of the total annual revenues accruing from the sale of all Lottery tickets and shares from all Lottery Games shall be expended for the payment of the expenses of the State Lottery." (Emphasis added.)[10]

Because section 7(2) of Measure 5 does not include any category specifically denominated "costs of administration," that subsection informs us that the "costs of administration" of the lottery generally are categorized as "expenses" of the Commission and the State Lottery. Section 7(4) informs us that "expenses" are broadly and non-inclusively defined. However, we note that, although a broad range of goods and services apparently is permitted to be leased or purchased under section 7(4), those goods and services must be "required by the Commission" and must be "necessary for effectuating the purposes of this Act." That wording suggests that "expenses" relate to the internal implementation and management of the lottery.

Considering the foregoing text and context, we conclude that the term "costs of administration" and the phrase "administering and operating," as used in Article XV, sections 4(3) and 4(4)(e), relate to the "expenses" or "costs" of the internal implementation and management of the lottery.

### B. *ORS 461.546(1) and Administrative Expenses*

Finally, we consider whether the expenditures authorized by ORS 461.546(1) are administrative expenses permitted by Article XV, section 4(3) and 4(4)(e). We begin by asking whether expenditures for "gaming law enforcement," as that term is used in ORS 461.546(1)(a), properly can be considered an administrative expense of the lottery.

ORS chapter 461 does not define "gaming law enforcement." The ordinary meaning of the noun "gaming" is "the act or practice of playing a game for stakes." Webster's Third New International Dictionary 933 (1976). The noun "game" is defined in part as "an amusement or pastime"; "a

---

[10] Sections 7(1) to 7(4) of Ballot Measure 5 now are codified at ORS 461.510(1) to 461.510(4). *See also* ORS 461.530 ("There is hereby created within the General Fund the Oregon State Lottery Fund which is continuously appropriated for the purpose of administering and operating the commission and the state lottery.").

physical or mental competition conducted according to rules." *Ibid.* The noun "stake" is defined in part as a "sum of money or its equivalent risked"; "the prize set in any contest." Webster's Third New Int'l Dictionary 2220 (1976). *See also* ORS 167.117(5) (defining "gambling" as the activity that occurs when "a person stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under the control or influence of the person, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome"); ORS chapter 464 (providing for the regulation of bingo, lotto, and raffle "games" and establishing the Oregon Gaming Account). Those definitions suggest that the term "gaming" has broad applicability.

Giving the term "gaming" its ordinary meaning, we conclude that the term "gaming law enforcement" refers broadly and generally to enforcement of laws relating to the playing of games for stakes or prizes, including *but not limited to* games operated by the State Lottery. We turn to the question whether expenditures for "gaming law enforcement," as so understood, are administrative expenses of the State Lottery within the meaning of Article XV, sections 4(3) and 4(4)(e). We conclude that, even though "gaming laws" are laws that relate to the playing of games for stakes or prizes, including games operated by the State Lottery, expenditures for a county's enforcement of such laws are not an administrative expense of the lottery. That is because, although some gaming law enforcement complements the operation of the lottery, expenditures for gaming law enforcement are not expenses or costs of the internal implementation or management of the lottery.[11]

It remains for us to decide whether the expenditures authorized in ORS 461.546(1)(b) — for "community mental health programs to treat gambling addiction" — are administrative expenses allowed by Article XV, sections 4(3) and 4(4)(e). Although the need for such programs may result in

---

[11] ORS 461.546(1)(a) allocates funds *"to the county"* for "gaming law enforcement." (Emphasis added.) Nothing in our opinion should be read, however, to affect expenditures *by the State Lottery Commission* for the purposes of maintaining security and ensuring the State Lottery's own compliance with the laws governing operation of the lottery.

part from the operation of the lottery, expenditures for mental health programs to treat gambling addiction also are not expenses or costs of the internal implementation or management of the lottery. Accordingly, those expenditures are not administrative expenses of the State Lottery within the meaning of Article XV, sections 4(3) and 4(4)(e).

We hold that ORS 461.546(1), on its face, violates Article XV, sections 4(3) and 4(4)(e), of the Oregon Constitution.

## CONCLUSION

In summary, ORS 461.215 and 461.217 do not, on their face, violate Article XV, section 4(7), of the Oregon Constitution. ORS 461.546(1), on its face, violates Article XV, sections 4(3) and 4(4)(e), of the Oregon Constitution.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

**FADELEY, J.,** concurring in part and specially concurring in part.

I concur with the decision announced in the lead opinion but write separately because I do not think this case, which is decided on the sufficiency of plaintiffs' pleadings alone, provides a platform for announcing an intricate scheme of rules for interpreting initiated constitutional amendments.

This case involves only the meaning of a few of the words newly enacted in 1984 in an initiated constitutional amendment, namely, the words "casino," "costs of administration," and "creation of jobs and economic development." The parties make no issue or contest for us to resolve concerning methodology for use in interpreting initiated constitutional amendments. Announcing an interpretational scheme when there is no controversy results in abstract judicial legislating.

The Oregon Constitution, Article XV, section 4, originally provided in part:

"[L]otteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the Legislative Assembly shall prevent the same by penal laws."

In 1984, the people by initiative measure amended that prohibitory article to permit the state to operate a State Lottery through a Lottery Commission.[1]

After that amendment, the constitution continued to prohibit and limit state participation in gambling except as provided in the 1984 amendment. The first subsection of that amendment states:

"Except as provided in subsections (2), (3), (4), (5), and (6) of this section, lotteries and the sale of lottery tickets, for any purpose whatever, are prohibited, and the Legislative Assembly shall prevent the same by penal laws."

The listed exceptions to the general prohibition are as follows:

Subsection (2) permits charitable bingo;

Subsection (3) creates a State Lottery Commission and State Lottery and places limits on the expenditure of "[a]ll proceeds from the State Lottery";

Subsection (4) authorizes, in paragraph (d), a State Lottery and lottery games using terminals, but limits the kinds of game procedures that "[t]he State Lottery may operate" to those authorized by the "Commission," specially removes some kinds of gambling from the Commission's jurisdiction, and also, in paragraph (e), limits the use of total revenues "from the sale of all lottery tickets or shares";

Subsection (5) provides for start-up funding of "the Commission and the State Lottery";

---

[1] That amendment, in part now Oregon Constitution, Article XV, section 4(3), provides:

"There is hereby created the State Lottery Commission which shall establish and operate a State Lottery. * * *"

Section 4(4)(d) in part provides:

"The Director shall implement and operate a State Lottery pursuant to the rules, and under the guidance, of the Commission."

Creation of the State Lottery, and a constitutionally empowered commission to operate it, were not the first relaxation since statehood of laws against state involvement in gambling. State-regulated racetrack betting was enacted in 1933. Or Laws 1933, ch 397. And, in 1976, a public vote authorized the legislature to provide for the establishment, operation, and regulation of bingo, lotto, and raffles conducted by "charitable, fraternal or religious organizations." Or Const, Art XV, § 4.

Subsection (6) provides that "[o]nly one state lottery operation shall be permitted in the State."

One constitutional restriction, Oregon Constitution, Article XV, section 4(7), provides:

"The Legislative Assembly has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon."

A second restriction prohibits the Lottery from engaging in certain kinds of gambling.

Yet another set of restrictions in the 1984 constitutional amendment circumscribes the uses of all money received from the State Lottery. All funds not needed for prizes paid and administration and operation of the Lottery Commission and the retailing of the lottery games through the Commission are dedicated to "creating jobs and furthering economic development" within the state. The constitution limits use of proceeds received by the Commission to "costs of administration," also referred to alternatively as "expenses" of the State Lottery. Or Const, Art XV, § 4(3) and (4)(e).[2]

The 1991 legislature enacted statutes authorizing the Lottery Commission to initiate video poker and other interactive video gambling machines, but only if the machines are located in places that are licensed to sell intoxicants and only if limited to five machines for each such licensed premises. ORS 461.215 and 416.217. The legislature also directed distribution of some of the proceeds from the

---

[2] Oregon Constitution, Article XV, section 4(3), provides in part:

"All proceeds from the State Lottery, including interest, but excluding costs of administration and payment of prizes, shall be used for the purpose of creating jobs and furthering economic development in Oregon."

Article XV, section 4(4)(e) provides in part:

"[T]he State Lottery shall operate as a self-supporting revenue-raising agency of state government and no appropriations, loans, or other transfers of state funds shall be made to it. The State Lottery shall pay all prizes and all of its expenses out of the revenues it receives from the sale of tickets or shares to the public and turn over the net proceeds therefrom to a fund to be established by the Legislative Assembly from which the Legislative Assembly shall make appropriations for the benefit of the public purpose of creating jobs and furthering economic development in Oregon. At least 84% of the total annual revenues from the sale of all lottery tickets or shares shall be returned to the public in the form of prizes and net revenues benefiting the public purpose."

"video lottery games" to counties in which the machines producing the revenues were located. The legislature designated these funds to pay "law enforcement" and "mental health" costs for gaming or gambling. ORS 461.546(1).

Plaintiffs assert that the foregoing portions of the 1991 enactments contravene either the constitutional prohibition against casinos (ORS 461.215 and 461.217), the constitutional dedication of all of the proceeds of any state lottery (ORS 461.546(1)), or both. On the motion of defendants and intervenors, the trial court entered judgment on the pleadings against plaintiffs on their amended complaint without a factual hearing or trial. I turn to an examination of each of the two theories.

I

CASINO

Plaintiffs' complaint alleged: "When implemented pursuant to * * * ORS 461.215 as amended, state-sponsored video poker will have the effect [when operated 'on such premises in conjunction with other gambling games sponsored by Defendants'] of creating casino gambling in the State of Oregon, in violation" of the constitution. I understand "casino" to be used in the pleading in its normal meaning, which includes a building or room "*for* gambling," *i.e.*, dedicated to substantial gambling activity. Webster's Third New International Dictionary 347 (Unabridged 1976) (emphasis added). No litigant suggests any other meaning, although some suggest, in addition, that you cannot have a casino where only interactive machines are used to gamble. Plaintiffs seek a hearing under those allegations to prove that the "video lottery games located in a liquor licensee's premises would constitute that establishment as a casino."

According to the legislation under constitutional attack in this case, the subject of this litigation is described as "a game or games using video devices," "video lottery games," "game terminals and equipment," and "video lottery terminals," ORS 461.215; and is further described in ORS 461.217 as a "video lottery game terminal that offers a video lottery game" and "video lottery machines." Those two statutes require that the "video lottery machines" be limited

to no more than five such machines on premises described in the statute.[3]

The statutes also limit locations where the machines may be placed to "only on the premises of an establishment that has a contract with the state lottery as a video lottery game retailer" and also "only on the premises of an establishment licensed by the Oregon Liquor Control Commission" and having certain kinds of liquor licenses. ORS 461.215 and 461.217.

Because of the five-machine limitation on any one premises licensed by the Oregon Liquor Control Commission, it is not apparent that the legislation establishes, or may establish, a casino. Plaintiffs allege no facts specific to video poker or other "video lottery games" as to how implementation of those games, even in conjunction with each other, "will have the effect of creating casino gambling." Plaintiffs' allegation that that effect will be created is by itself but a conclusion, not an allegation of fact, and as such is insufficient in this constitutional context to create an issue for hearing. *See Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 322, 811 P2d 116 (1991) (Fadeley, J., concurring) (making similar point). Plaintiffs here have not sought to file a further or second amended complaint alleging facts that, if proved, would establish that creation or operation of a casino or casinos has been legislatively authorized in contravention of the constitution. On the basis discussed in this opinion, I would reverse the Court of Appeals' remand and affirm the judgment of the circuit court on the "casino," or pleading, phase of the case.

---

[3] About 6,000 video poker machines have been placed by the State Lottery Commission among approximately 1,300 retailer locations, with 90 percent of the retailers having the maximum of five machines per location. Cortright, Staff Report to the Joint Legislative Task Force on Lottery Oversight, "Do Current Video Lottery Retail Commissions Maximize Net State Revenue?" 2 (Feb. 1994). According to that report, gross wagering on video lottery games during fiscal year 1993 was nearly one billion, five-hundred eleven million dollars ($1,511,000,000). *Id.* at 6. After paying prizes, net revenues of nearly one-hundred sixty-eight million dollars ($168 million) were produced. *Ibid.* Video poker is played by a single player operating a video terminal. A player buys credits, recorded in the machine, for use in betting whether the single player will win or not. *Id.* at 8. The player's winnings are also recorded as credits in the machine and may be bet without a further infusion of cash by the player. The report does not describe whether the gross wagering revenue amount reported above is composed of player cash only or also includes the winnings credits recorded in the machine and wagered again therein.

## II

## ECONOMIC DEVELOPMENT

Plaintiffs also seek a hearing to elicit facts to prove the amended complaint's allegations that the transfer of some of the lottery proceeds to counties — to pay local law enforcement expenses or for hiring mental health workers to deal with gambling addicts — is not within the limited purposes for which lottery proceeds may be spent under the strictures stated in the Oregon Constitution.

The Attorney General, whose duty it is to uphold statutes passed by the legislature where that is even a remote possibility, and intervenors, who are businesses that may be licensed as video lottery game retailers under ORS 461.215, contend that the legislative transfer of lottery proceeds to the county should be counted as an expense of administration of the State Lottery Commission and that, as an expense of the Commission, the transfer is constitutional.[4]

The state constitutional provisions, quoted above, show a clear intention of the people to restrict the uses of lottery funds to the administrative expenses of the Commission (and the State Lottery agency) and to prizes and economic development, including job creation. Net proceeds are to be turned over to "a fund * * * for the benefit of the public purpose of creating jobs and furthering economic development" in Oregon. Those net proceeds are to be what is left over after "[t]he State Lottery shall pay all prizes and all of its expenses out of the revenues it receives." Or Const, Art XV, § 4(4)(e).[5] Expenses are also limited by the requirement to

---

[4] It is also contended that spending the lottery money to hire mental health workers to provide services to gambling addicts creates jobs and, therefore, complies with the purposes of using the balance of the money, beyond administrative expenses, for prizes and "creation of jobs and furthering economic development."

The "creation of jobs" argument appears to prove too much. Under it, any hiring of an employee by state or local government, whether the employee provided a new service or an existing service, would appear to qualify as "creating jobs," thus permitting use of lottery funds to pay salaries of as many public employees as those funds were sufficient to cover.

[5] Article XV, section 4(4)(e), provides in part:

"The State Lottery shall pay all prizes and all of its expenses out of the revenues it receives from the sale of tickets or shares to the public and turn over the net proceeds therefrom to a fund * * * for the benefit of the public purpose of creating jobs and furthering economic development in Oregon. At least 84% of

return 84 percent of "total annual revenues * * * to the public." *Id.*[6]

## III

## CONSTITUTIONAL INTERPRETATION

The intent of the voters who adopted the constitutional amendment must control our interpretation and application of it. It is the touchstone for any interpretation of an initiated measure. The best evidence of that intent, in an initiated amendment, is found in the material that all voters had before them when they voted, namely, the caption and question portions of the ballot title, which are printed directly on all ballots used by all absentee and regular voters to cast their votes. In determining the voters' intent, I cannot join the lead opinion in relegating to a secondary status the one thing that all voters are most likely to read before voting to amend the constitution. I think the scheme chosen by the lead opinion, which fails to give primary status to the ballot title along with the text of the amendment to which it relates, fails to reflect our common knowledge about the phenomenon of voting on an initiative measure. I would, instead, in deciding the case, review the plain language of the ballot title and the amendment text as adopted.

Because the caption and question are printed on the ballot used by every person who voted to adopt the initiative amendment, it is the single most reliable source of the actual

---

the total annual *revenues from the sale of all* lottery tickets or *shares* shall be returned to the public in the form of prizes and net revenues benefiting the public purpose [of creation of jobs and furthering economic development]." (Emphasis added.)

[6] No issue is raised by the parties in this case concerning how this 84 percent provision fits with OAR 177-100-020, which compensates video poker retailers with "35 percent of the amount remaining of gross revenue after prizes have been paid to players." In fiscal year 1993, $58.4 million was paid to retailers of video lottery games on a net after prizes of $167.6 million. Cortright, *supra* note 3, at 6, citing to Lottery Commission Fiscal Year 1993 Financial Summary. This compares to commissions of $15 million paid to retailers of "traditional" lottery games on a net after prizes of $102.4 million for that year. At the time the State Lottery was created, what is now ORS 461.310 limited the percentage to be paid as compensation to retailers to 6 percent "of the retail price of the * * * shares," "[u]ntil the commission shall otherwise determine."

intention of the voters.[7] It is the *only* common source of information about the amendment that is certainly available to *every* voter. It is true that an official Voters' Pamphlet is mailed to every Oregon *household* where one or more registered voter resides, but even the Voters' Pamphlet section for any initiated measure begins with the ballot title caption and question, only thereafter printing the words of the measure. Many voters, including absentee voters, may not have the opportunity to read the text of the measure, but all must see the caption and question printed on the ballot that they cast. I believe that, in determining voter intent, the caption and question are of at least equal value with a measure's text that many voters do not in fact read.[8]

The ballot title *Caption* for the 1984 amendment provided:

> "Constitutional Amendment
> Establishes State Lottery Commission;
> Profits For Economic Development"

The ballot title *Question* provided:

> "Shall a state lottery operated by commission be established, profits to be used to create jobs and further economic development?"

In both, the emphasis on using State Lottery gambling profits for economic development is clear. Had the intention of the voters been to treat lottery profits as merely another revenue source — available to pay any and all expenses related to state governmental activity — they would not have voted to approve the measure presented by that caption and question

---

[7] ORS 254.175 permits printed ballots to omit the ballot title's summary. Many counties do omit it.

[8] The lead opinion disregards this knowledge about voter information and downgrades the caption and question printed on the ballot to a lesser status than that accorded the text of the measure. I cannot join in rejecting the most certain indicator of the voters' intent.

I also find it unnecessary, and probably unwise, to look to statutes to interpret the meaning of initiated constitutional provisions. Even if that were a generally proper method to determine voters' intent, there are sufficient clear indicators of intent within the constitutional context to make a reference to contemporaneous statutes unnecessary.

Further, I cannot join the relegation of "legislative facts" to a lesser status than "text and context" in determining the intent of the voters, as the lead opinion's footnote 8 does without citation to authority.

and containing the restriction on use of proceeds, contained in subsections 4(3) and (4) of the measure, which the ballot title so strongly emphasizes.

It follows from the foregoing that the diversion of State Lottery proceeds to pay local government salary expenses enacted by ORS 461.546 is not constitutionally permissible. That statute section is therefore a nullity, as plaintiffs have alleged and contended. The further hearing ordered by the Court of Appeals' decision, and to be held in circuit court, is one related to that statute and, therefore, has no function. Accordingly, that decision appropriately should be reversed on the ORS 461.546 phase of the case. I would join the lead opinion, for the reasons stated here, and reverse both the judgment of the circuit court and the Court of Appeals' remand, and enter declaratory judgment in favor of plaintiffs, as prevailing party, declaring ORS 461.546(1) unconstitutional and void, and in favor of defendants, as to ORS 461.215 and 461.217, declaring those statutes constitutional and valid.

**UNIS, J.,** concurring in part, specially concurring in part.

I agree with the majority's holding in this case and with most of its analysis. I am not willing, however, to join that part of the opinion that suggests that this court should put on analytical "blinders" so as to avoid considering relevant information as to what the voters intended in enacting an initiated constitutional provision.[1] In interpreting an initiated constitutional provision, this court should consider available sources of information that bear on the interpretation of the provision. For example, even if the text and context seem unambiguous, I believe that this court should examine sources of information that were available to the voters that

---

[1] In *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993), this court, in a unanimous opinion, which I authored, stated:

"In interpreting a constitutional provision adopted through the initiative process, our task is to discern the intent of the voters. * * * [I]f the [voters'] intent is clear based on the text and context of the constitutional provision, the court does not look further." (Citing *Comeaux v. Water Wonderland Improvement Dist.*, 315 Or 562, 569, 570, 847 P2d 841 (1993).)

Upon further reflection, I now believe, as I state in the text, that this court should also consider available sources of information that bear on the voters' intent.

may disclose the voters' understanding and intent in enacting an initiated constitutional provision. This includes, at least, those portions of the ballot title (normally the caption and question, ORS 254.175) that were actually before the voters at the time that they cast their ballots on the measure.[2]

In my view, the available sources of information that bear on the voters' intent in this case, including the caption and ballot title, support the conclusion reached by the majority.

---

[2] I find it unnecessary in this case to state what weight should be given in this interpretive process to any particular source of information bearing on the voters' intent.