Argued and submitted March 14; resubmitted en banc August 8,
affirmed November 22, 2000

STATE OF OREGON, ex rel Brady ADAMS,
Gene Derfler, Ted Ferrioli, Bill Fisher,
Gary George, Lenn L. Hannon, Tom Hartung,
John Lim, Randy Miller, David Nelson,
Eileen Qutub, Marylin Shannon, Charles Starr,
Veral Tarno, Eugene Timms and Thomas Wilde,
*Appellants,*

*v.*

Michael POWELL,
*Respondent,*

*and*

John A. KITZHABER,
Governor for the State of Oregon,
*Intervenor-Respondent.*

(9905-05147; CA A107123)

15 P3d 54

Gregory A. Chaimov argued the cause for appellants. With him on the briefs was the Office of the Legislative Counsel.

Thomas A. Balmer argued the cause for respondent. With him on the brief was Ater Wynne LLP.

Jacob Tanzer argued the cause for intervenor-respondent. With him on the brief was Henry H. Lazenby, Jr., Governor's Legal Counsel.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler and Brewer, Judges.

DE MUNIZ, J.

Edmonds, J., dissenting.

## DE MUNIZ, J.

Plaintiffs, all of whom are state senators, appeal from a trial court judgment in favor of defendant Michael Powell and intervenor Governor John Kitzhaber in this *quo warranto* proceeding initiated pursuant to ORS 30.510 to remove Powell from the Board of Commissioners of the Port of Portland. The trial court held that Powell may hold over from his prior term in office until a successor is confirmed and found qualified. Plaintiffs appeal, and we affirm.

The parties have stipulated to the following facts. The governor appointed Powell to a four-year term as a commissioner of the Port of Portland in 1993, and the senate confirmed that appointment. In 1997, the governor reappointed Powell to a second term but the senate voted not to confirm Powell for that second term. The governor then reappointed Powell again, and the senate has taken no action on the second reappointment. No successor to Powell has been appointed, confirmed and qualified. Powell continues to serve as a commissioner of the Port of Portland.

Plaintiff senators initiated this proceeding in *quo warranto*,[1] alleging that Powell holds office unlawfully because his reappointment was rejected by the senate in 1997. The appointment of commissioners of the Port of Portland is subject to confirmation by the senate under ORS 171.562 and ORS 171.565. Plaintiffs rely on the provisions of ORS 236.010(1)(h) and Article III, section 4(2), of the Oregon Constitution, to support their position that Powell currently holds the office unlawfully. ORS 236.010(1) provides, in part:

"An office shall become vacant before the expiration of the term if:

"* * * * *

---

[1] ORS 30.510 codifies *quo warranto* proceedings as follows:

"An action at law may be maintained in the name of the state, upon the information of the district attorney, or upon the relation of a private party against the person offending, in the following cases:

"(1) When any person usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise within this state, or any office in a corporation either public or private, created or formed by or under the authority of this state[.]"

"(h)   Appointment of the incumbent is subject to Senate confirmation under section 4, Article III of the Oregon Constitution and the appointment is not confirmed."

That subsection was added to ORS 236.010(1) in 1979 to implement the newly enacted Article III, section 4, of the Oregon Constitution, which provides, in part:

"(1)   The Legislative Assembly in the manner provided by law may require that all appointments and reappointments to state public office made by the Governor shall be subject to confirmation by the Senate.

"(2)   The appointee shall not be eligible to serve until confirmed in the manner required by law and if not confirmed in that manner, shall not be eligible to serve in the public office."

In their answers, defendant Powell and intervenor Kitzhaber asserted that Powell's continuation in the office of commissioner of the Port of Portland is authorized by ORS 778.215(1) and Article XV, section 1, of the Oregon Constitution, because under those provisions an appointee remains in office until a successor has been appointed and has qualified for the position. ORS 778.215(1) provides:

"Upon the expiration of the term of a commissioner [of the Port of Portland], a successor shall be appointed by the Governor, subject to confirmation as provided by ORS 171.562 and 171.565. Except as provided in ORS 778.220 [concerning removal for malfeasance in office] and 778.235 [concerning vacancies created when commissioner refuses to serve or fails to attend], appointees, when confirmed, shall hold office for a term of four years and until their respective successors have been appointed, confirmed and qualified."

That statute is in accord with Article XV, section 1, of the Oregon Constitution, which provides:

"(1)   All officers, except members of the Legislative Assembly and incumbents who seek reelection and are defeated, shall hold their offices until their successors are elected, and qualified."

As discussed below, the Oregon Supreme Court has held that Article XV, section 1, applies to appointed officers as well as to elected officers.

The trial court appears to have believed that both statutory provisions and both constitutional provisions could be given full effect by concluding that, under ORS 236.010(1)(h) and Article III, section 4, Powell's office became "vacant" when the senate failed to reconfirm him but that, due to the holdover provisions ORS 778.215(1) and Article XV, section 1, the office was only "constructively vacant" and that Powell could continue to serve in the "vacant" office until a successor had been appointed and qualified.

On appeal, plaintiffs argue that the trial court erred in concluding that Powell could continue to serve as a commissioner of the Port of Portland, citing the same statutory and constitutional provision on which they relied below. Plaintiffs assert that ORS 778.215(1) permits only *qualified* commissioners to hold over until a successor is appointed and that a person whose confirmation has been rejected is not qualified due to the provisions of ORS 236.010, which prescribes the qualifications for all offices. They further assert that Article III, section 4(2), bars a "reappointee" as well as an appointee from continuing to serve in an office if the Senate has voted to deny confirmation. In effect, plaintiffs argue that Article III, section 4(2), mandates the provisions of ORS 236.010(1)(h) and that, to the extent that ORS 778.215(1) conflicts with that mandate, it is unconstitutional. As to Article XV, section 1, plaintiffs maintain that its holdover provision applies only insofar as the person in question is not otherwise disqualified from holding the office under ORS 236.010 and Article III, section 4(2). Thus, plaintiffs maintain, pursuant to ORS 236.010 and Article III, section 4(2), that Powell may not continue as a commissioner of the Port of Portland.

Defendant and intervenor assert that the statutes are reconcilable. They argue that ORS 778.215(1) provides for Powell to continue in office until a successor has been appointed, confirmed and qualified and that the reference in ORS 236.010(1)(h) to "the incumbent" applies only to an officer who is a recess or interim appointee who has never previously been confirmed by the senate. Alternatively, they maintain that if there is a conflict between ORS 778.215(1) and ORS 236.010(1)(h), then the more specific provisions of

ORS 778.215(1), which apply only to Port of Portland commissioners, should control over the more general provisions of ORS 236.010 that apply to all officers. Finally, they assert that, if ORS 236.010(1)(h) supports plaintiffs' position, then it conflicts with Article XV, section 1, of the Oregon Constitution and that Article XV, section 1, is not in conflict with Article III, section 4(2), which limits only the ability of unconfirmed appointees to serve but does not similarly limit the ability of unconfirmed "reappointees."

We begin by noting that we cannot give each statute its plain meaning and reconcile the two, much less reconcile them in any manner that obviates the need to address the constitutional issues. Nor is this a case in which we are obliged to consider statutory questions first, in hopes of resolving the issues without having to reach constitutional questions, because each side maintains that the statute that supports the other side's position violates a constitutional provision.

■■■ Were ORS 778.215(1) the only provision at issue here, there would be no doubt of Powell's eligibility to continue as a commissioner of the Port of Portland until his successor is "appointed, confirmed and qualified." That statute contains several exceptions—those set out in ORS 778.220 and ORS 778.235—but does not deny commissioners the right to continue in office when the legislature fails to reconfirm them. Plaintiffs argue that the exceptions contained in the statute are not exclusive and that ORS 236.010 contains additional exceptions. Several principles of statutory interpretation cut against plaintiffs' suggested interpretation. First, a more specific statute generally controls over a general statute on the same subject, and ORS 778.215 is more specific than ORS 236.010, because it applies specifically to port commissioners. ORS 174.020. Second, under ORS 174.010, we are constrained from inserting into a statute that which the legislature has omitted; accordingly, we conclude that, where ORS 778.215 contains a list of reasons why a commissioner of the Port of Portland may not continue to serve until a successor is appointed, confirmed and qualified, and lack of reconfirmation is not on that list, lack of reconfirmation does not constitute such a reason.

■ ORS 236.010(1)(h), on the other hand, indicates that an office such as the office held by Powell may become vacant before the end of a term if "[a]ppointment of the incumbent is subject to Senate confirmation under section 4, Article III of the Oregon Constitution and the appointment is not confirmed." Defendant argues that this statute may be interpreted in such a manner that it does not conflict with ORS 778.215 if we interpret the term "incumbent" narrowly to mean only incumbents who are interim appointees who have never been confirmed by the senate. There are two problems with that proposed construction. First, the word "incumbent" is used throughout ORS 236.010 in a manner that is inconsistent with the notion that it applies only to interim appointees. For instance, ORS 236.010(1)(b) and (e) refer, respectively, to "elected or appointed" incumbents and the "election or appointment" of incumbents. The term clearly is used to apply to elected officials as well as to appointed officials, and it therefore cannot apply only to interim appointees as used in those subsections. Generally, the "use of a term throughout a statute indicates that the term has the same meaning throughout the statute." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). It would seem unlikely, to say the least, that the legislature intended the term "incumbent" to be given different meanings in different subsections of ORS 236.010.

In any event, ORS 236.010(1)(h) does not merely use the term "incumbent"; it qualifies the term, making it clear that the term as used in that subsection applies specifically to incumbents who are "subject to Senate confirmation under section 4, Article III of the Oregon Constitution[.]" ORS 236.010(1)(h). Article III, section 4(1), provides that the legislature "may require that all appointments and reappointments to state public office made by the Governor shall be subject to confirmation by the Senate." It is undisputed that the office held by defendant Powell is subject to confirmation both on appointment and on reappointment. Powell's continuation in office after the senate's failure to reconfirm his appointment cannot be reconciled with ORS 236.010(1)(h).

Neither statute is ambiguous on its face. We conclude that the holdover provisions of ORS 778.215(1) and the vacancy provisions of ORS 236.010(1)(h) are in conflict. Both

appear to apply to Powell's situation; both cannot be given effect.[2]

■ Were there no constitutional dimension to this case, our next step would be to determine which statute is controlling. However, plaintiffs assert that ORS 778.215(1), as we have interpreted it, violates Article III, section 4, of the Oregon Constitution; defendant and intervenor contend that ORS 236.010(1)(h), as we have interpreted it, runs afoul of Article XV, section 1, of the Oregon Constitution. The question, then, becomes whether or to what extent those constitutional provisions are reconcilable with each other.

■ To interpret constitutional provisions, we look "to the specific wording [of each provision], the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). Article XV, section 1, was part of the original constitution of 1857. Article III, section 4, was created by Senate Joint Resolution 20 (1977 session) and adopted by Oregon voters in 1978. Because Article III, section 4, is relatively new and no case law interprets it, and because Article XV has been in existence in some form since the Oregon Constitution was adopted, we will begin with Article XV, viewing it in historical context and describing the case law interpreting it. Then we will turn to the question of whether Article III, section 4, is in conflict with Article XV, section 1, and whether the adoption of Article III, section 4, impliedly either amended or repealed Article XV, section 1.

Article XV, section 1, originally provided: "All officers except members of the legislative assembly shall hold their offices until their successors are elected, and qualified."

---

[2] No party on appeal advances the trial court's theory of "constructive vacancy," *i.e.*, that an appointee may continue to hold over in an office that has "become vacant before the expiration of the term" pursuant to ORS 236.010(1). We decline to adopt this notion of "constructive vacancy," as it would render the term "vacancy" as used in ORS 236.010(1) essentially meaningless. *Cf. State ex rel v. Tazwell*, 166 Or 349, 352, 111 P 1021 (1941) ("Vacancy in office means, as said by Mr. Justice McArthur in *State of Oregon v. Johns*, 3 Or 533, 537 [1869], the want of an incumbent at the time."); *State ex rel Musa v. Minear*, 240 Or 315, 322, 401 P2d 36 (1965) (If nobody is elected or qualified to succeed an incumbent, "[t]he post does not automatically become vacant, but the incumbent remains in office, *locum tenens,* * * * until he shall be superseded by a person authorized by law to be inducted into the office.").

Although we have found no pertinent legislative history from the constitutional convention, this provision has been interpreted on various occasions by the Oregon Supreme Court. The first case to explain the provision in detail was *State ex rel Everding v. Simon*, 20 Or 365, 26 P 170 (1891). In *Everding*, the 1885 Legislature had enacted a statute providing for the appointment of Portland police commissioners, to be followed by elections after their first term. The 1889 Legislature modified those provisions but neglected to provide either for election or appointment of new commissioners. *Id.* at 368-69. The question presented in the resulting litigation was whether one of the originally appointed commissioners continued to serve or whether a new commissioner, elected without statutory authority, replaced him. The court concluded that, because no qualified successor had been elected or appointed under existing law, Article XV, section 1, gave the appointed incumbent the right to hold over. The court stated:

"The reason of this rule is that public policy requires that the duties of the office be performed, and it is better that the incumbent should continue in the office and in the performance of its duties than that an interregnum should occur. It conserves the public interests by preserving the methods and instrumentalities by which alone public business can be transacted; while the opposite rule, when pushed to its consequences, might result in the suspension of business in many of the departments of public service." *Id.* at 378.

The court also applied Article XV, section 1, in resolving a dispute involving a railroad commissioner position, where the commissioner was chosen biennially by the legislative assembly. *Eddy v. Kincaid*, 28 Or 537, 41 P 157 (1895). There, the court rejected an argument that the legislature's failure to appoint a successor created a vacancy in the office and held that, under Article XV, section 1, "the incumbent of the office shall hold until his successor is elected and qualified." *Id.* at 560. Implicit in *Eddy*, and more explicitly in a later case, *State v. Compson*, 34 Or 25, 54 P 349 (1898), involving essentially the same subject matter, the court recognized that Article XV, section 1, applies not only to

officers elected in a general election but also to appointed officers. "The word 'elect' simply means to pick out, to select from among a number, or to make choice of, and is synonymous with the words 'choose,' 'prefer,' 'select,' and it was evidently used in this sense in the constitution." 34 Or at 33.

That construction of the term "elect" as used in Article XV, section 1, was reiterated in *State ex rel v. Tazwell*, 166 Or 349, 111 P2d 1021 (1941). In *Tazwell*, a *quo warranto* proceeding was initiated against a circuit court judge who had been defeated in a general election. After the person who won the election died before taking office, the governor attempted to appoint the relator to the circuit court position, and litigation ensued to determine who was entitled to the office. In deciding the matter, the court summarized its Article XV, section 1, and case law, including the cases cited above, concluding:

> "From these decisions, it is settled law in this state that public officers continue in office after the expiration of their official terms until their successors are duly qualified, and that this provision of the constitution is applicable to all public officers of this state, whether elective or appointive." *Id.* at 355.

The court went on to explain that the governor's power to appoint an officer to an office was limited by the constitution to situations in which there was a "vacancy" in the office. *Id.* at 357. The court concluded that, because there was no "vacancy" in the office at issue due to the hold over of the incumbent judge under the provisions of Article XV, section 1, the governor had no power to fill the office by appointment. *Id.* at 357-59.

In *State ex rel O'Hara v. Appling,* 215 Or 303, 334 P2d 482 (1959), the court again was required to interpret and apply Article XV, section 1, for the purpose of determining who properly occupied a public office. In November 1956, Mark Hatfield was elected secretary of state for a term of four years. In November 1958, while holding that office, he was elected governor. On January 7, 1959, the outgoing governor, Robert Holmes, appointed O'Hara as secretary of state. On January 8, 1959, Hatfield submitted a letter of resignation from the office of secretary of state. Governor Holmes

responded by letter, purporting to decline to accept the resignation. On the morning of January 12, 1959, Holmes' appointee, O'Hara, took the oath of office as secretary of state and filed the required bond. On the afternoon of the same day, Hatfield took the oath of office as governor and, after taking office, appointed Appling to the office of secretary of state. Appling then took the oath of office and filed the required bond. *Id.* at 305-07.

O'Hara initiated a *quo warranto* proceeding, asserting that, under Article XV, section 1, Hatfield continued to hold his office as secretary of state at the time that he took the oath of office as governor, because at that time his successor as secretary of state had not been appointed and qualified; that, as a result, Hatfield violated constitutional provisions prohibiting the holding of more than one "incompatible" office at the same time and prohibiting a person who holds another office from filling the office of governor; and that Hatfield therefore lacked gubernatorial authority to appoint Appling as secretary of state. *Id.* at 307-09.

The Supreme Court determined that the question of which governor had the authority to appoint a secretary of state depended on when, if at all, a vacancy arose in the latter office. *Id.* at 307. The court concluded that Oregon applies the doctrine of "implied resignation," whereby a person who assumes an office impliedly resigns a theretofore-held incompatible office. Under that principle, Hatfield resigned, and created a vacancy in, the office of secretary of state at the time he took the oath of office as governor.[3] Therefore, Holmes's attempt to appoint a secretary of state before that time was without legal effect, because the office was not vacant. *Id.* at 310-12.

In so deciding, the court also necessarily considered whether the requirement in Article XV, section 1—that officers hold office until their successors are elected and qualified—applies despite an officer's resignation. *Id.* at 312-13. In

---

[3] In so holding, the court expressly rejected the argument that a public officer cannot resign his or her office without the consent of the appointing power. *State ex rel O'Hara v. Appling,* 215 Or 303, 316, 334 P2d 381 (1959). At the same time, the court declined to express any opinion regarding the effectiveness of Hatfield's written resignation. *Id.* at 318.

analyzing that question, the court quoted from a decision of the Indiana Supreme Court, interpreting the provision of the Indiana Constitution from which Article XV, section 1, is derived, to the effect that the purpose of the provision is to prevent the occurrence of vacancies in office "except by death, resignation, removal and the like." *Id.* at 314. The court also noted the existence since 1854 of the statute now codified at ORS 236.010, providing that an office becomes vacant before the expiration of the term of office if "the incumbent dies, resigns, or is removed." *Id.* at 316. Finally, the court reached the same conclusion that it reached in *Fehl v. Jackson County,* 177 Or 200, 161 P2d 782 (1945), that "the word 'vacant' in [ORS 236.010] imports the same finality in the event of resignation as it does in the event of death or removal for the commission of a felony. There is no 'holding over' after the occurrence of any of these events." *Appling,* 215 Or at 316. The court concluded that Article XV, section 1, does not apply when an officer has resigned his or her office.

■ Consistent with those cases, we conclude that Article XV, section 1, confers a "right" on an incumbent to hold office beyond the term of office, unless one or more relevant circumstances—such as the officer's resignation or death—is present. None of those circumstances is present here. Accordingly, under Article XV, section 1, defendant Powell is entitled to retain his position as a commissioner of the Port of Portland.

Plaintiffs nevertheless argue that, under *Fehl,* an incumbent's right under Article IV, section 1, to "hold over" applies only if the incumbent maintains the statutory qualifications for the particular office. There are several problems with plaintiffs' argument. First, *Fehl* made no reference whatsoever to Article XV, section 1. It concerned when a judge convicted of a felony ceased to occupy the office of judge. 177 Or at 204-05. Pertinent constitutional and statutory provisions made it clear that the judge no longer was eligible to serve as judge after the conviction; the question was whether a removal suit was necessary to remove the judge from office or whether the event occurred by operation of law. *Id.* at 206-11. Neither *Fehl* nor *Appling* can be read as standing for the proposition that statutory provisions such as ORS

236.010 control over the holdover provisions of Article XV, section 1.

In summary, as it relates to the present case, the case law interpreting Article XV, section 1, establishes that the holdover provision applies to appointees such as Powell in the circumstance presented here.[4]

■ In the general election of 1978, Article III, section 4, was added to the Oregon Constitution by referendum. As quoted above, this constitutional provision provides for senate confirmation of gubernatorial appointments and reappointments. Materials contained in the Voters' Pamphlet concerning a referendum provide some historical context for an initiated or referred measure. *See generally Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560 n 8, 871 P2d 106 (1994). The explanatory statement contained in the 1978 Voters' Pamphlet stated:

> "This measure would amend the Oregon Constitution to add a new part. That part would allow the Legislative Assembly to require that the Governor's appointments to state public office be approved or disapproved by the Senate. A person could not serve until approved and if not approved could not serve at all. The new part also applies to the Governor's appointments to fill vacancies in state elective offices but does not apply to judges, United States Senators and Representatives and district, county and precinct offices.
>
> "**Present procedure.** Presently, the Senate has statutory authority to approve or disapprove of the Governor's appointments where required by law. Between sessions, the Senate acts through a committee. During a session, the entire Senate approves or disapproves of the appointments. A person may serve while awaiting approval. However,

---

[1] In the general election of 1970, Article XV, section 1, was amended by referendum. That amendment added the italicized language to the provision:

"All officers, except members of the Legislative Assembly *and incumbents who seek reelection and are defeated*, shall hold their offices until their successors are elected, and qualified."

An additional section provided that a defeated incumbent would hold office only until the end of the term, and, in the case of an election contest between an incumbent and a challenger where no successor had been qualified, an appointee could serve until the resolution of the election contest. No party to this appeal suggests that that amendment affects the analysis of the present case in any way.

another appointment must be made if either the committee or the full Senate disapproves of the appointment. The Senate's authority does not cover the Governor's appointments to vacant state elective offices.

> "**Proposed change**. The proposed change would place the Senate's confirmation authority in the Oregon Constitution instead of the statutes. The Legislative Assembly would then have to enact new statutes governing the specific appointments and the manner of confirmation during the interim between sessions."[5]

That referendum was proposed and adopted after a governor's appointee to the Board of Examiners of Nursing Home Administrators was rejected by the senate, and the appointee took office despite lack of confirmation. *See generally* 39 Op Atty Gen 608 (1979).[6]

■ From our review of case law interpreting Article XV, section 1, it appears certain that before Article III, section 4, was enacted Powell could have held over in the office of commissioner until a successor was appointed and qualified. Indeed, plaintiffs do not dispute that point. The parties also agree that Article III, section 4, does not expressly amend or repeal Article XV, section 1. The narrow question presented here is whether Article III, section 4, amends Article XV, section 1, by implication, making it inapplicable to incumbents who are not confirmed by the Senate following reappointment. For reasons discussed below we answer that question in the negative.

■ We have examined the specific wording, the case law, and the historical circumstances surrounding each provision. *Priest*, 314 Or at 415-16. Defendant Powell and intervenor governor correctly assert that the court's function is to interpret constitutional language in a way that "harmonizes" potentially conflicting provisions. *See In re Fadeley*, 310 Or 548, 560, 802 P2d 31 (1990). When possible, we must give

---

[5] Although the Voters' Pamphlet contained a statement in favor of the referendum and a statement in opposition to it, we find nothing in either of those statements that might assist in resolving the issue presented in this case.

[6] The senate attempted to resolve the matter through the court system, but the Oregon Supreme Court concluded that the senate had initiated the wrong type of proceeding and did not decide the case on the merits. *State ex rel Boe v. Straub*, 282 Or 387, 578 P2d 1247 (1978).

effect "to every part and every word of a Constitution and that unless there is some clear reason to the contrary, no portion of the fundamental law shall be treated as superfluous." *See State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954), *quoting* 11 Am Jur 665, *Constitutional Law*, § 5.

Defendant and intervenor suggest that it is possible to give meaning to all parts of Article XV, section 1, and Article III, section 4, by distinguishing between "all appointments and reappointments * * * shall be subject to confirmation" as stated in Article III, section 4(1), and the "appointee shall not be eligible to serve until confirmed" as stated in Article III, section 4(2). They agree that, under section 4(1), Powell's reappointment is subject to confirmation by the senate. They argue, however, that, because section 4(2) refers only to an "appointee" rather than to an "appointee or reappointee," it imposes no limitation on the ability of a "reappointee" such as Powell to continue to serve despite the senate's refusal to confirm him. Plaintiffs respond that Powell is ineligible to serve because the word "appointee" in section 4(2) must be read to include a "reappointee" such as Powell.

■ Interpreting the text of Article III, section 4, and Article XV, section 1, harmoniously does not require us to adopt any parties' principal argument. Article XV, section 1, assures that no interregnum occurs when a successor to public office, whether elected or appointed, is unable to take office. Specifically, the incumbent may hold over and no vacancy results. *See Tazwell*, 166 Or at 352; *Minear*, 240 Or at 322. The constitutional holdover provision makes no distinction between incumbents, like Powell, who are reappointed and incumbents who are to be succeeded by another. Thus, we conclude it applies equally in both circumstances. Article III, section 4, does two things. Section 4(1) permits the legislature to require confirmation of new appointees as well as incumbents who are reappointed. Section 4(2) specifies that *any* appointee who is not confirmed in the manner required by law shall not be eligible to serve. The key to harmonizing the two provisions is to interpret Article III, section 4, prospectively, looking to the *new* term for which the most recent appointment has been made. In contrast, Article XV,

section 1, applies retrospectively to the *past* term. Under Article III, section 4(2), an unconfirmed appointee is unable to take office for the term that he or she was appointed to fill. Where the incumbent is unable to serve the *new* term, he or she may, nevertheless, continue to serve the *past* term until such time as a new appointee can be qualified.

If plaintiffs are correct in their assertion that Article III, section 4, impliedly amends Article XV, section 1, then it follows that an incumbent would *never* hold over when confirmation is denied, regardless of whether the appointee for the new term is the incumbent or someone else. Under plaintiffs' interpretation, *whenever* confirmation is denied, Article III, section 4, creates a vacancy, and Article XV, section 1, is without effect because its purpose is to prevent vacancies when a public office cannot be filled.

However, Article III, section 4, says nothing about creating vacancies. Thus, if it amends Article XV, section 1, as plaintiffs urge, it does so entirely by implication, a doctrine that is disfavored in Oregon. *Klamath Falls v. Oregon Liquor Comm.*, 146 Or 83, 90, 29 P2d 564 (1934). By amending Article XV, section 1, plaintiffs' interpretation of Article III, section 4, would not give effect "to every part and every word of a Constitution." *Lonergan*, 201 Or at 177; *see also State v. Guzek*, 322 Or 245, 266-67, 906 P2d 272 (1995) (refusing to amend statute by implication and applying maxim of construction that gives effect to potentially conflicting statutes at the first level of textual analysis). Accordingly, we decline to adopt plaintiffs' interpretation. Our interpretation of Article III, section 4, is true to the text, giving each word full effect *without* amending the historical role of Article XV, section 1.[7]

In the dissent's view, our analysis is flawed because it renders the word "reappointments" in Article III, section 4(1) meaningless. 171 Or App at 105 n 4. We disagree that our analysis fails to give full effect to Article III, section 4.

---

[7] Because this *quo warranto* action is resolved by harmonizing Article III, section 4, and Article XV, section 1, it is unnecessary for us to specifically address the constitutionality of ORS 236.010(1)(h). We note, however, that to the extent the statute purports to create vacancies in public offices that are lawfully occupied by incumbents who hold over, it is in direct conflict with Article XV, section 1.

Specifically, under section 4(2), unconfirmed appointees cannot serve the term to which they were appointed. That result applies equally to "appointments" and "reappointments." The fact that incumbents may hold over under another constitutional provision does not change the analysis. It is a mistake to conclude that there are no practical consequences when an unconfirmed appointee holds over. Those consequences are political because, ultimately, the question of who succeeds Powell as commissioner of the Port of Portland is a political one that must be resolved by the governor and the senate. Our construction of Article III, section 4, recognizes that reality; gives full effect to Article III, section 4, and Article XV, section 1; and permits the public's business to continue until the political impasse is resolved. We express no opinion about what the parties might be required to do toward that end or what issues might be relevant in a proceeding other than *quo warranto*.[8]

We reiterate that this case is decided under *quo warranto,* answering only the question whether Powell usurps his office. A writ of *quo warranto,* ORS 30.510, the remedy sought here, is provided by statute for the removal of a person who holds public office unlawfully. *State ex rel Boe v. Straub,* 282 Or 387, 390, 578 P2d 1247 (1978). Here, Powell may not serve the new term because he was not confirmed on reappointment. However, as the incumbent, Powell lawfully holds over as a commissioner of the Port of Portland under the authority of the constitutional holdover provision, Article XV, section 1, until a successor is appointed and confirmed.

Affirmed.

**EDMONDS, J.,** dissenting.

The determinative issue in this case is whether the people of the State of Oregon intended that appointments and reappointments to state public office made by the governor would become subject to confirmation by the senate when they enacted Article III, section 4, of the Oregon Constitution

---

[^] We do note, however, that the Senate is not without alternatives. ORS 171.565(1), for example, provides, in part:

"If an appointment is not confirmed by the Senate, the Governor shall make another appointment, subject to confirmation by the Senate."

as an initiative measure in 1978. If they did, we have no authority, constitutional or statutory, to do other than declare and honor their intent. The intent of the measure on its face could not be more clear. That intent is further confirmed when the history underlying the measure is examined. Article III, section 4, was intended to amend Article XV, section 1, of the Oregon Constitution, by repealing section 1's holdover provision to the extent it would otherwise apply to reappointments subject to senate confirmation.

The majority reaches a contrary conclusion as the result of its resort to a maxim of constitutional construction in lieu of determining the intent of Article III, section 4, by the usual means. That methodology is flawed because it uses a principle intended to aid courts to discern the probable intent of a constitutional provision when it is unnecessary in this case. The result of the majority's analysis is that the initiative process reserved to the people by Article IV, section 1 (2)(a)[1] is effectively nullified and the well-recognized doctrine of amendment or repeal by implication no longer has efficacy in Oregon jurisprudence, even when it is clear that amendment was intended by the electorate.

Article III, section 4, provides, in pertinent part:

"(1)   The Legislative Assembly in the manner provided by law may require that all appointments and reappointments to state public office made by the Governor shall be subject to confirmation by the Senate.

"(2)   The appointee shall not be eligible to serve until confirmed in the manner required by law and if not confirmed in that manner, shall not be eligible to serve in the public office."

The majority and I agree that the word "appointee" in section 4 refers to incumbents and newly named appointees. It follows that defendant, as the governor's appointee, is subject to its provisions.

---

[1] Section 1 (2)(a) provides:

"The people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly."

Article XV, section 1, of the Oregon Constitution, provides:

"All officers, except members of the Legislative Assembly and incumbents who seek reelection and are defeated, shall hold their offices until their successors are elected, and qualified."

Section 1 applies to appointed officers as well as elected officers and was in existence at the time that the people enacted Article III, section 4.

The resolution of the issue is determined by ascertaining the intent of the voters in 1978 regarding the continuing validity of Article XV, section 1, when they enacted Article III, section 4.

"In interpreting a constitutional provision adopted through the initiative process, our task is to discern the intent of the voters. The best evidence of the voter's intent is the text of the provision itself. The context of the language of the ballot measure may also be considered; however, if the intent is clear based on the text and context of the constitutional provision, the court does not look further." *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993) (citations and footnotes omitted).

The provision of Article XV, section 1, providing for the hold over by the appointed incumbent when a vacancy occurs is clearly inconsistent with the provision of Article III, section 4, which expressly provides that "[t]he appointee shall not be eligible to serve until confirmed in the manner provided by law and if not confirmed in that manner, shall not be eligible to serve in the public office." Only the failure of Article III, section 4, to expressly amend Article XV, section 1, provides any ground for debate. The majority seizes on that omission. It says,

"[u]nder plaintiff's interpretation, *whenever* confirmation is denied, Article III, section 4, creates a vacancy, and Article XV, section 1, is without effect because its purpose is to prevent vacancies when a public office cannot be filled.

"However, Article III, section 4, says nothing about creating vacancies. Thus, if it amends Article XV, section 1, as plaintiffs urge, it does so entirely by implication, a doctrine that is disfavored in Oregon. * * * By amending Article XV,

section 1, plaintiffs' interpretation of Article III, section 4, would not give effect 'to every part and every word of a Constitution.' " 171 Or App at 99 (emphasis in original; citations omitted).

In *State v. Guzek*, 322 Or 245, 266-68, 906 P2d 272 (1995), the court rejected the argument that the voters had intended to amend ORS 163.150 (1985) by implication before it attempted to harmonize two statutes. Here, the majority uses a principle of constitutional construction in lieu of interpreting the voters' intent and before considering whether they intended to repeal section 4. The majority's explanation for its understanding is that "section 4 says nothing about creating vacancies." 171Or App at 99. However, that argument begs the question. If Article III, section 4, was intended to amend the holdover provision of Article XV, section 1, as applied to appointees, necessarily, it was intended to create vacancies when no confirmation occurred. That maxim of giving effect where possible to every word and every part of a constitutional provision is a maxim to aid the court in determining the *probable intent* of language that has a *disputed* meaning. The maxim, which is intended to give effect to all language in the constitution, presupposes that both provisions are intended to be included in the constitution at the same time. Thus, the maxim can play no role in the situation where the issue is not to interpret both provisions so as to give both meaning, but to ascertain whether the original language was intended by the voters to be repealed by the new provision.[2]

Also, the majority cites *Klamath Falls v. Oregon Liquor Comm.*, 146 Or 83, 29 P2d 564 (1934) in support of its analysis. However, the court in *Klamath Falls* held that an initiative *did* repeal by implication the constitutional authority of municipalities to control and regulate the sale of alcoholic beverages, thereby making use of the very doctrine that

---

[2] In the context of interpretation of legislative intention, the Supreme Court has held that when "the language of a statute is sufficiently clear so as to reveal the legislature's intent, it is both unnecessary and improper to resort to such 'rules' or 'maxims' of statutory construction." *Whipple v. Howser,* 291 Or 475, 487, 632 P2d 782 (1981). Simplistic applications of the maxims of statutory interpretation may be useful tool for decision, but they do not substitute for specific analysis in the first instance." *State v. Wagner,* 309 Or 5, 9, 786 P2d 93, *cert den* 498 US 879, 111 S Ct 212, 112 L Ed 2d 171 (1990).

the majority denigrates in deference to its maxim of constitutional interpretation. *City of Klamath Falls* stands for the proposition that the doctrine of implied amendment is alive and well in Oregon jurisprudence when it is necessary to carry out the intent of the voters.

Even if the intent of the voters is not clear from the text and context of the measure, we need not resort to maxims of constitutional construction to ascertain the voters' intent.[3] As the Supreme Court stated in *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559-60 n 8, 871 P2d 106 (1994), the public's understanding of a measure is to be ascertained from materials that were available to the voters at the time of its adoption. In voting on the adoption of Article III, section 4, the voters had the following materials before them. The ballot title appeared as follows:

BALLOT TITLE

| **2** AUTHORIZES SENATE CONFIRMATION OF GOVERNOR'S APPOINTMENTS -- Purpose: Proposed constitutional amendment authorizes legislation requiring confirmation by the State Senate of all appointments and reappointments to state public office by the Governor, including vacancies in elective office except judges, United States Senator or Representative, and district, county and precinct offices. Appointees are not eligible to serve until and unless confirmed as required by law. | YES ☐<br><br>NO ☐ |
|---|---|

The official Explanation included the statement, "A person could not serve until approved and if not approved could not serve at all."

---

[3] The majority correctly cites *Priest v. Pearce*, 314 Or 411, 416-17, 840 P2d 65 (1992) (holding that there are three levels at which constitutional interpretation occurs: text and context; case law; and history underlying the provision). Mistakenly, it resorts to a principle of constitutional construction without dealing with the history of Article III, section 4, as *Ecumenical Ministries* instructs. *See also Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 57, 11 P3d 228 (2000). As authority for its methodology, it relies on *State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954). The language on which the majority relies in *Lonergan* is a quotation from 11 Am Jur 665. It does not purport to establish a template for constitutional interpretation.

In evaluating the import of these materials, we apply the same method of analysis that we use to ascertain the intent of the legislature when we interpret a statute. Words of common usage are given their plain, natural and ordinary meaning. *Ecumenical Ministries*, 318 Or at 560. There are three words in Article III, section 4, and its history whose ordinary meanings are important to the issue before us. They are, "appointments," "reappointments," and "appointees." According to *Webster's Third New International Dictionary*, 105 (unabridged ed 1993), the word "appointment" includes the "designation of a person to hold a nonelective office or perform a function." The word "appointee" refers to "one that is appointed (as to an office)." *Id*. The word "reappointment" connotes a "second or fresh appointment." *Id*. at 1891.[4] The ordinary meanings of the words, "appointment," "reappointment," and "appointee" in Article III, section 4, create an obvious conflict with the language of Article XV, section 1, when it is given its ordinary meaning. Section 1 plainly requires that all officers except members of the legislative assembly and incumbents "shall hold their offices until their successors are elected and qualified." Before the enactment of Article III, section 4, appointed public officers had a qualified right to serve until their successors were confirmed to take their place under Article XV, section 1.[5] Under the later-enacted Article III, section 4, those public officers whose reappointments depend on senate confirmation are not eligible to continue to serve until confirmation occurs. The two constitutional provisions are in irreconcilable conflict, but that conflict is easily resolved by viewing the subsequent amendment as impliedly amending the earlier constitutional provision.

---

[1] If a person who is reappointed is not subject to confirmation as posited by defendant, then there would have been no need to have used the word "reappointments" in in addition to the word "appointments " in Article III, section 4(1). The word "appointment" in section 4(1) would have been the only word needed. The panel's analysis renders the word "reappointments" in section 4(1) meaningless. It follows that the word "appointee" in section (2) must refer to initial appointments *and* to reappointments.

[5] As the majority indicates, there are circumstances such as resignation or the commission of a felony to which the holdover provision of Article XV, section 1, obviously does not apply.

The argument for an implied amendment is supported by the language of section 4, its ballot title and the explanatory statement in the Voters' Pamphlet, and also by the circumstances under which the measure was adopted. In 1977, the legislature referred Senate Joint Resolution 20 to the voters, and it appeared on the November 1978 general election ballot. The legislature referred the measure after Governors McCall and Straub challenged the authority of the Senate to reject their appointments, notwithstanding a century of history of the requirement of senate confirmation of certain gubernatorial appointees. 39 Op Atty Gen 608 (1979). The precise issue that prompted the resolution was described by Attorney General Redden:

"The issue was raised again more recently by action of the Senate Committee on Appointments in rejecting confirmation of Governor Straub's appointee to the Board of Examiners of Nursing Home Administrators. Asserting that the requirement of confirmation violated Or. Const. art. III, sec. 1, the Governor directed the appointee to take office and he did so. A mandamus suit was subsequently filed in the Supreme Court to require the Governor to make a new appointment. The court dismissed the writ without considering the constitutional question, on grounds it should have been filed as an action in the nature of *quo warranto*[.]

"Meanwhile, the legislature passed SJR 20, proposing adoption of a constitutional provision relating to confirmation, and in November 1978, it was approved by the people as a new section 4 of Article II of the Oregon Constitution." *Id.* at 609.

The doctrine of implied amendment by implication is a recognized rule of law to be applied when two constitutional provisions are in irreconcilable conflict.[6] It is a doctrine that should be used when the people's intent to amend an existing constitutional provision is clear, from the above-described materials. As the official explanation in the Voters' Pamphlet told the voters in 1978, "A person could not serve until

---

[6] Article XV, section 1, continues to govern elected public officials and the appointment of those public officers whose appointments are not subject to senate confirmation.

approved and if not approved could not serve at all." Defendant Powell is an appointee who has not been approved for a new term by the senate, and Article III, section 4, plainly applies to him. In the face of the overwhelming evidence about the people's intent, the majority errs when it rules, without citation to authority, that the doctrine of implied amendment is trumped by an inapplicable rule of constitutional construction.

For these reasons, I dissent.

Landau, J., joins in this dissent.