Argued and submitted October 18; on respondent's motion to determine jurisdiction and notice of probable mootness filed July 19, and appellants' response to motion to determine jurisdiction and notice of probable mootness filed July 31, 2007, motion to determine jurisdiction allowed; claim for injunctive relief dismissed as moot; otherwise affirmed May 14, petition for review allowed August 6, 2008 (345 Or 175)

PENDLETON SCHOOL DISTRICT 16R;
Eugene School District 4J;
Crow-Applegate-Lorane School District 66;
Coos Bay School District 9; Corvallis School District 509J;
Josephine County Unit/Three Rivers School District;
Astoria School District 1C; Creswell School District;
Lincoln County School District; Siuslaw School District 97J;
Centennial School District; Amity School District 4J;
Reynolds School District #7; Coquille School District #8;
Parkrose School District #3; Pine Eagle School District #61;
Jefferson School District; McKenzie School District;
Alexandra Kiesling and Timothy Kiesling, minors,
by Amy Cuddy, their guardian ad litem;
Grace Peyerwold, a minor,
by David and Maria Peyerwold, her guardians ad litem;
Marshall Taunton and Harrison Taunton, minors,
by Tim and Wendy Taunton, their guardians ad litem;
and Benjamin Sherman and Claire Sherman, minors,
by Larry Sherman and Diane Nichol, their guardians ad litem,
*Plaintiffs-Appellants,*

*v.*

STATE OF OREGON,
*Defendant-Respondent.*

Multnomah County Circuit Court
060302980; A133649

185 P3d 471

James N. Westwood argued the cause for appellants. With him on the briefs and response to motion were Robin Beck Skarstad, Robert D. Van Brocklin, and Stoel Rives LLP. On the opening briefs was David. H. Angeli.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, Charles Fletcher, Assistant Attorney General, and Katherine Georges, Assistant Attorney General. With him on the motion were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Ortega, Judge, and Sercombe, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Article VIII, section 3, of the Oregon Constitution obligates the legislature to "provide by law for the establishment of a uniform, and general system of Common schools." Article VIII, section 8(1), of the Oregon Constitution further provides:

"The Legislative Assembly shall appropriate in each biennium a sum of money sufficient to ensure that the state's system of public education meets quality goals established by law, and publish a report that either demonstrates the appropriation is sufficient, or identifies the reasons for the insufficiency, its extent, and its impact on the ability of the state's system of public education to meet those goals."

In this case, plaintiffs—18 Oregon school districts and seven public school students—contend that the legislature has violated those constitutional obligations. According to plaintiffs, the 2005 Legislative Assembly determined the amount of money necessary to ensure that the state's system of public education meets the goals set by law, but then it failed to appropriate that amount of money, as they contend Article VIII, sections 3 and 8(1), require. They initiated this action for a declaratory judgment to that effect and an injunction requiring the legislature to appropriate funds sufficient to meet the obligations imposed by Article VIII, sections 3 and 8(1).

The state contends that the case is nonjusticiable because the courts lack authority to order the legislature to comply with Article VIII, sections 3 and 8(1), even assuming that they impose the obligations that plaintiffs contend. In the alternative, the state contends that, the 2005 legislature having adjourned, the case is moot. As to the merits, the state argues that Article VIII, sections 3 and 8(1), do not require the legislature to appropriate any particular amount of money; rather, Article VIII, section 8(1), expressly authorizes the legislature to appropriate less than what would otherwise be sufficient as long as it identifies the reasons for the insufficiency.

We conclude that the state is incorrect that we lack authority even to review plaintiffs' Article VIII, sections 3

and 8(1), claims. We agree with the state, however, that the claim for injunctive relief as to the 2005 legislative session is moot. On the merits, we likewise agree with the state that neither section 3 nor section 8(1) of Article VIII imposes an obligation on the legislature to appropriate any particular amount of money to fund the state's public schools.

## I.  BACKGROUND

On November 7, 2000, the voters approved initiated Ballot Measure 1, which, on January 1, 2001, became Article VIII, section 8(1), of the Oregon Constitution:

> "The Legislative Assembly shall appropriate in each biennium a sum of money sufficient to ensure that the state's system of public education meets quality goals established by law, and publish a report that either demonstrates the appropriation is sufficient, or identifies the reasons for the insufficiency, its extent, and its impact on the ability of the state's system of public education to meet those goals."

The 2001 Legislative Assembly supported the voters' decision by statutorily implementing Ballot Measure 1. Or Laws 2001, ch 895. ORS 327.497(3) essentially restates the constitutional provision.[1] ORS 327.500 creates the Quality Education Commission (QEC), consisting of 11 members

---

[1] ORS 327.497 provides:

"The Legislative Assembly finds that:

"(1) Within the Oregon Educational Act for the 21st Century in ORS chapter 329 there are established goals for high academic excellence, the application of knowledge and skills to demonstrate achievement and the development of lifelong learning skills to prepare students for the ever-changing world.

"(2) Education is increasingly linked to economic and social issues.

"(3) The people of Oregon, through section 8, Article VIII of the Oregon Constitution, have established that the Legislative Assembly shall appropriate in each biennium a sum of money sufficient to ensure that the state's system of public education meets the quality goals established by law. Furthermore, the people of Oregon require that the Legislative Assembly publish a report that either demonstrates that the appropriation is sufficient or identifies the reasons for the insufficiency, its extent and its impact on the ability of the state's system of public education to meet those goals.

"(4) The Quality Education Commission should be established to define the costs sufficient to meet the established quality goals for kindergarten through grade 12 public education."

appointed by the Governor. The QEC is charged with establishing "quality goals" for public education, kindergarten through grade 12 (K-12), determining each biennium the amount of money sufficient to meet the established goals, and issuing a report to the Governor and the legislature that identifies the costs of current and best practices in public education and expected student performance under each goal. ORS 327.506(2) - (4).[2]

In addition, the legislature enacted provisions requiring both the Governor and the Legislative Assembly to publish reports each biennium demonstrating that the amount in their respective budgets for public education is the amount of moneys as determined by the Quality Education Commission * * * that is sufficient to meet the quality goals," or identify why "the amount appropriated * * * is not sufficient, and the extent of the insufficiency and the impact of the insufficiency on the ability of the state's system of * * * public education to meet the quality goals." ORS 291.228(1); ORS 171.857(2)(a), (b). If the Legislative Assembly determines that the report of the QEC should not be used as the basis for carrying out the legislature's reporting requirements, the Legislative Assembly is required to "identify the reasons for not using the report" and outline an "alternative methodology" for its findings, which must be based on "(A) [r]esearch, data and public values; and (B) [t]he performance of successful schools [or] professional judgment * * *." ORS 171.857(3)(a), (b).[3]

The Oregon legislature has never met the funding goals established by the QEC, and the gap between the amount needed to achieve the educational goals and actual funding has grown each biennium.

In December 2002, the QEC issued its first biennial report, which told the legislature that it needed to appropriate an additional $1.4 billion in the 2003-05 biennium to implement the quality goals established by the QEC. The

---

[2] ORS 327.500 was amended in 2005. Or Laws 2005, ch 209, § 8. ORS 327.506 was amended in 2003 and 2007. Or Laws 2003, ch 303, § 14; Or Laws 2007, ch 858, § 31. All references are to the versions in effect during the 2005 legislative session.

[3] ORS 171.857 was amended in 2003. Or Laws 2003, ch 14, § 69. We apply that version, which was in effect during the 2005 legislative session.

2003 Legislative Assembly responded with an appropriation that was 69 percent of the recommended level, accompanied by a report explaining the shortfall.

For the 2005-07 biennium, the QEC recommended an appropriation of $7.1 billion for K-12 public education, and the 2005 Legislative Assembly appropriated $5.239 billion, accompanied by a report concluding simply that "the amount of moneys appropriated for the 2005-07 biennium for K-12 public education is insufficient to meet the recommended funding levels of the Quality Education Commission" and acknowledging that its process did not even assess the adequacy of its funding level.

In March 2006, plaintiffs filed their complaint against the state, seeking a declaration under the Declaratory Judgments Act, ORS 28.010 to 28.169, that Article VIII, sections 3 and 8(1), require the legislature "to appropriate in each biennium a sum of money to ensure that the state's system of K-12 public education meets quality goals established by law," and a mandatory injunction requiring the legislature to provide constitutionally adequate funding for K-12 public education for the 2005-07 biennium.[4]

_____

[4] The prayer of the complaint asks for judgment as follows:

"a. Declaring that (i) the Legislature must abide by the Oregon Constitution and, pursuant to Article VIII, section 8 of the Oregon Constitution, must appropriate for each biennium a sum of money sufficient to ensure that the state's system of K-2 public education meets the quality goals established by law, and (ii) the Legislature has failed to appropriate a sum of money sufficient to ensure, for the 2005 - 07 biennium, that the state's system of K-12 public education meets the quality goals established by law;

"b. Declaring that (i) the Legislature must abide by the Oregon Constitution and, pursuant to Article VIII, section 3 of the Oregon Constitution, must appropriate funds sufficient to maintain an adequate system of K-12 schools, and (ii) the Legislature has failed to appropriate a sum of money sufficient to maintain an adequate system of K-12 public schools for the 2005 - 07 biennium;

"c. Issuing a mandatory injunction requiring defendants to appropriate for the current biennium funding sufficient to provide the Required Service Levels, *i.e.*, the service levels that the Commission determined were necessary to achieve quality goals established by law;

"d. Awarding plaintiffs their costs and reasonable attorney fees incurred in the prosecution of this action; and

"e. Awarding such other and further relief as this Court may deem just and proper."

On cross-motions for summary judgment, the trial court accepted the state's view that Article VIII, sections 3 and 8(1), do not mandate a particular level of legislative funding for public education, and dismissed all of the claims.

## II. ANALYSIS

We begin with the state's arguments concerning the justiciability of plaintiffs' claims on appeal and then proceed with an analysis of the case on the merits.

A. *Authority of the courts to enforce Article VIII, sections 3 and 8(1)*

■    The state asserts that plaintiff's claims are nonjusticiable because, even if the legislature is constitutionally required to provide a specific level of funding for public education, the courts do not have authority to direct the legislature to comply with that requirement. In support of that assertion, the state relies solely on the Supreme Court's opinion in *Tillamook Co. v. State Board of Forestry*, 302 Or 404, 413, 730 P2d 1214 (1986), which the state contends stands for the proposition that "the judicial power does not extend to enjoining the legislature to enact or refrain from enacting future laws and equally does not extend to issuing a declaration that would form the basis for an injunction of that nature or have an equivalent effect on the legislature." Plaintiffs contend that the state reads more into the Supreme Court's decision than an examination of its actual holding will bear out. We agree with plaintiffs.

In *Tillamook Co.*, 12 Oregon counties brought a declaratory judgment action against the state Board of Forestry concerning the distribution of revenues derived from tax-foreclosed forest land that the counties conveyed to the state for the Board of Forestry to manage. Among other things, the counties sought a declaration that, once the forest lands were conveyed to the state, the legislature could not change the distribution formula for the revenues derived from the management of those lands without the consent of the counties. The Supreme Court concluded that that claim was not justiciable, given the fact that no such legislation actually had been enacted. 302 Or at 413. The court

explained that the counties were, in effect, "seek[ing] a judicial declaration of the validity of *potential* legislative enactments." *Id.* (emphasis in original). That, the court held, "is nothing beyond an abstract question," and "Oregon courts do not give advisory opinions." *Id.*

■■ *Tillamook Co.* has no application to this case. Plaintiffs in this case are not seeking a declaration as to the validity of future, potential legislation. They are plainly seeking a declaration as to the constitutional validity of past legislative action. Such matters are not abstract but concrete and, frankly, fit quite comfortably within the constitutional and statutory authority of the courts. As the courts of this state have long held, the judiciary is charged with responsibility for determining the meaning of constitutional provisions and whether legislative enactments conform to the requirements of those constitutional provisions as interpreted by the courts. *See Eckles v. State of Oregon*, 306 Or 380, 403, 760 P2d 846 (1988); *Jory v. Martin*, 153 Or 278, 307, 56 P 1093 (1936); *Eastern & Western Lbr. Co. v. Patterson*, 124 Or 112, 120, 258 P 193 (1927), *on reh'g*, 124 Or 146, 264 P 441 (1928), *aff'd*, 278 US 581, 49 S Ct 184, 73 L Ed 518 (1929) (the exercise of the power to hold a law to be invalid because of its conflict with the constitution is the ultimate and supreme function of courts). The Declaratory Judgments Act further gives the courts the power to grant declaratory relief, so long as it will affect "in the present some rights between the parties." *Barcik v. Kubiaczyk*, 321 Or 174, 188, 895 P2d 765 (1995). We reject the state's contention that we lack authority to consider plaintiffs' claims at all.

B. *Whether all or part of plaintiffs' claims are moot*

We turn to the state's contention that plaintiffs' claims should be dismissed as nonjusticiable because they are moot. As we recently noted in *Friends of Columbia Gorge v. Columbia River Gorge*, 215 Or App 557, 571, 171 P3d 942 (2007), the law pertaining to justiciability, in general, and mootness, in particular, is not especially clear, because of some tension between two Supreme Court decisions, *Yancy v. Shatzer*, 337 Or 345, 97 P3d 1161 (2004), and *Kellas v. Dept. of Corrections*, 341 Or 471, 145 P3d 139 (2006).

In *Yancy*, the Supreme Court explained—after a lengthy analysis of the history of the framing of the Oregon Constitution and the case law construing it—that such issues as standing, ripeness, and mootness are aspects of justiciability, that is, the authority of the court to exercise judicial power as authorized under Article VII (Amended), section 1, of the Oregon Constitution. Specifically, the court held that the judicial power "does not extend to moot cases," even moot cases "that are capable of repetition, yet evading review." *Yancy*, 337 Or at 363.

In *Kellas*, however, the court cautioned against reading into the judicial power clause of Article VII (Amended), section 1, "constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government." 341 Or at 478. The court expressed special disdain of "import[ing]" into Oregon law federal conceptions of justiciability, given that those conceptions are based on a "case or controversy" provision of the federal constitution that finds no counterpart in the constitution of this state. *Id.* The specific holding of *Kellas* pertained to standing, and the extent to which the constitution imposes limitations on the legislature's power to confer standing to seek judicial review in the absence of a concrete stake in the outcome of the proceeding. But the court's broader pronouncements about the scope of Article VII (Amended), section 1, and the viability of state justiciability doctrines leave the current status of those doctrines in some doubt. As we noted in *Friends of Columbia Gorge*, "*none* of the traditionally recognized aspects of justiciability identified in *Yancy*—standing, ripeness, or mootness, for that matter—finds the sort of direct textual support in the state constitution that, after *Kellas*, the court now appears to require." 215 Or App at 571-72 (emphasis in original).

But, however difficult the cases are to reconcile, the fact is that *Kellas* did not overrule *Yancy*; indeed, the court in *Kellas* cited *Yancy*, if only once and in passing. *Kellas*, 341 Or at 479-80. We conclude that, whatever the broader discussion in *Kellas* might otherwise suggest, *Yancy* remains good law, and mootness remains an aspect of justiciability. The Supreme Court's own case law since *Kellas* seems to assume that to be the case, as well. *See, e.g., Crandon Capital*

*Partners v. Shelk*, 342 Or 555, 562, 157 P3d 176 (2007) (addressing whether to dismiss a case on mootness grounds).

In *Yancy*, the Supreme Court explained that a controversy is justiciable when "there is an actual and substantial controversy between parties having adverse legal interests." 337 Or at 349 (quoting *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982)). A case becomes "moot" when there is no longer such a substantial controversy, that is, when the court's exercise of authority would no longer have a "practical effect" on the rights of the parties to the controversy. *Yancy*, 337 Or at 349.

In considering whether plaintiffs' claims are moot, we look first to the substantive allegations of the complaint. *See Crandon Capital Partners*, 342 Or at 562. Plaintiffs' declaratory and injunctive relief claims assert that Article VIII, sections 3 and 8(1), of the Oregon Constitution require the legislature to fund K-12 public education as required to meet "quality goals established by law" and in an amount greater than the legislature appropriated for the 2005-07 biennium. The first and second claims seek declaratory relief for the 2005-07 biennium and future biennia. The third claim seeks injunctive relief for the 2005-07 biennium. The complaint alleges that "[y]ears of inadequate funding have severely diminished the quality of K-12 public education in Oregon," and that "the severe K-12 budget shortfall has adversely affected school districts and children across the state."

The state asserts that, to the extent plaintiffs' claims relate to the legislature's failure to appropriate funds for the 2005-07 biennium, they are moot, because the 2005-07 biennium is now over. Accordingly, the state asserts, any declaration or injunction with respect to the 2005-07 biennium cannot affect any right belonging to plaintiffs, and the claims for relief are moot.

We agree with the state's argument as to the claim for injunctive relief. Because any exercise of authority by this court directing action with regard to the 2005-07 biennium can have no practical effect on the parties, the claim for injunctive relief is moot. However, plaintiffs' claims are not limited to injunctive relief. Plaintiffs also seek a declaration

as to whether, in making the 2005-07 appropriation, *see* Or Laws 2005, ch 786, the legislature satisfied the requirements of Article VIII, sections 3 and 8(1). They allege continuing harm as a result of the legislature's alleged erroneous interpretation of its obligations under Article VIII, sections 3 and 8(1), and past inadequate funding. Those claims present an ongoing and justiciable controversy. We turn, then, to the merits of plaintiffs' claims for declaratory relief arising out of Article VIII, sections 3 and 8(1).

## C. *Article VIII, section 3*

■      Article VIII, section 3, is an original constitutional provision and provides that "[t]he Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common schools." Plaintiffs contend that that provision requires "some level of adequacy" in funding of public education. Their argument in support of that assertion, however, is quite brief and not entirely clear. They assert that the matter is one of "first impression" and then—without further reference to the text, history, or case law construing the provision, *see generally Priest v. Pearce,* 314 Or 411, 415-16, 840 P2d 65 (1992) (interpretation of provisions of original constitution require analysis of text, history, and case law construing the provisions)—turn to decisions of other jurisdictions interpreting similar constitutional provisions. The state responds that, in fact, the matter is not one of first impression and that existing case law forecloses plaintiffs' contention that Article VIII, section 3, requires the legislature to appropriate any particular level of funding for the support of schools. We agree with the state.

In *Olsen v. State ex rel Johnson,* 276 Or 9, 27, 554 P2d 139 (1976), the Supreme Court held:

> "We are of the opinion that Art VIII, § 3, is complied with if the state requires and provides for a minimum of educational opportunities in the district and permits the districts to exercise local control over what they desire, and can furnish, over the minimum."

Beyond those minimum "opportunities," this court has held, relying on *Olsen,* that Article VIII, section 3, "does not pertain to school funding at all." *Sherwood School Dist. 88J v.*

*Washington Cty. Ed.*, 167 Or App 372, 382, 6 P3d 518, *rev den*, 331 Or 361 (2000). Rather, Article VIII, section 3, is about uniformity in education. *Id.* Funding for public education was to be derived from the Common School Fund and applied and distributed pursuant to Article VIII, sections 2 and 4. 167 Or App at 380. In light of that case law, we reject without further discussion plaintiffs' contention that Article VIII, section 3, should be read to mandate a particular level of funding for public education.

D.  *Article VIII, section 8(1)*

We turn to the meaning of Article VIII, section 8(1). In interpreting a constitutional provision adopted through the initiative process, our task is to discern the intent of the voters. *Li v. State of Oregon*, 338 Or 376, 388, 110 P3d 91 (2005); *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993). Determining voter intent is accomplished by application of the same interpretive principles that apply to the interpretation of statutes. *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 57, 11 P3d 228 (2000); *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560, 871 P2d 106 (1994) (citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993)). That is to say, we look first to the text of the provision in context and then, if necessary to resolve an ambiguity, to its enactment history. *Li*, 338 Or at 388-89; *Ecumenical Ministries*, 318 Or at 560. The history of the provision includes "sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure," including the ballot title and arguments for and against the measure included in the voters' pamphlet, and contemporaneous news reports and editorial comments on the measure. *Ecumenical Ministries*, 318 Or at 560 n 8. Caution must be exercised before ending the analysis without considering the history of the initiated constitutional provision. *Id.* at 559 n 7; *see also Coultas v. City of Sutherlin*, 318 Or 584, 590, 871 P2d 465 (1994) ("It is an unusual case in which the text and context of a[n initiated] constitutional provision reflect the intent of the voters so clearly that no alternative reading of the provision is possible.").

We turn first to the text of the provisions, which is the "best evidence" of the intent of the voters. *Ecumenical Ministries*, 318 Or at 559. Article VIII, section 8(1), provides:

> "The Legislative Assembly shall appropriate in each biennium a sum of money sufficient to ensure that the state's system of public education meets quality goals established by law, and publish a report that either demonstrates the appropriation is sufficient, or identifies the reasons for the insufficiency, its extent, and its impact on the ability of the state's system of public education to meet those goals."

In plaintiffs' view, the text of Article VIII, section 8(1), plainly imposes on the legislature two mandates: First, the legislature "*shall* appropriate" funds sufficient to meet quality goals established by law. Second, and independently, the legislature "shall * * * publish a report" concerning the adequacy of its appropriations. Plaintiffs insist that their construction is required by the ordinary meaning of the mandatory "shall" that refers to the act of appropriating and to the conjunction "and" that separates the appropriation requirement from the reporting requirement. According to plaintiffs, the two obligations are separate and independent.

The state responds that plaintiffs' construction ignores a significant portion of the text of the provision, namely, the portion that expressly permits the legislature to publish a report that "identifies the reasons for the *insufficiency*" of its appropriations, should the legislature appropriate less than the sum that is sufficient to meet the QEC's recommendations. According to the state, the constitutional provision expressly contemplates circumstances in which the legislature appropriates an *insufficient* amount for school funding; there would otherwise be no reason to include a requirement to report the reasons for such an insufficiency, the state contends. We agree with the state.

Plaintiffs' reading of Article VIII, section 8(1), certainly is consistent with the ordinary meaning of the words that they choose to emphasize—"shall" and "and." The word "shall" is commonly used as a command, used to express what is mandatory. *See, e.g., Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 91, 23 P3d 333 (2001) (the word "shall" "is a statement prescribing how government must conduct its

functions"); *Preble v. Dept. of Rev.*, 331 Or 320, 324, 14 P3d 613 (2000) (the word "shall," as used in particular statutory provisions, connotes a command). And the word "and" commonly is employed to signify a conjunctive. *See, e.g., Preble,* 331 Or at 325 (when multiple requirements are connected by the word "and," they are commonly conjuncts, not alternatives); *McCabe v. State of Oregon,* 314 Or 605, 610-11, 841 P2d 635 (1992) ("Generally, the words 'and' and 'or,' as used in statutes, are not interchangeable.").

■       But words of an enactment—constitutions or statutes—are not examined in a vacuum; they must be examined in context. *See, e.g., Vsetecka v. Safeway Stores, Inc.*, 337 Or 502, 508, 98 P3d 1116 (2004) ("Viewed in isolation, that text provides support for employer's position. Ordinarily, however, 'text should not be read in isolation but must be considered in context.' " (quoting *Stevens v. Czerniak,* 336 Or 392, 401, 84 P3d 140 (2004))); *Lane County v. LCDC,* 325 Or 569, 578, 942 P2d 278 (1997) ("[W]e do not look at one subsection of a statute in a vacuum; rather, we construe each part together with the other parts in an attempt to produce a harmonious whole.").

In this case, the disputed words are used in a sentence that states that the legislature "shall appropriate" a sufficient sum of money to meet quality goals established by law "*and* publish a report that *either* demonstrates the appropriation is sufficient, *or identifies the reasons for the insufficiency*" of the appropriation. (Emphasis added.) Thus, the conjunction "and" that follows the statement of the obligation to appropriate is itself followed by two alternatives, one that is predicated on full and sufficient educational funding and one that expressly assumes the possibility of funding "insufficiency." Unless we ignore the implication of the second alternative—that the legislature may, in some cases, appropriate insufficient funds—plaintiffs' reading of the provision is untenable. That means that the word "and" separating the two legislative obligations—to fund and to report—must be used in a *dis*junctive sense and that the word "shall" was, as a result, intended to be permissive.

It is not that unusual to read the word "and" in that fashion. In common speech, the word "and" is used in a disjunctive sense. Thus, the sentence, "if you obtain a passport,

you may travel to England, France, and Germany," does not mean that obtaining a passport entitles one to travel only to *all three* countries. Clearly, the word is being used in a disjunctive sense. *See Webster's Third New Int'l Dictionary* 80 (unabridged ed 2002) (defining "and" to include "reference to either or both of two alternatives * * * esp. in legal language when also plainly intended to mean *or*") (emphasis in original). The possibility has been recognized by Oregon appellate courts, as well. *See, e.g., Ollilo v. Clatskanie P. U. D.*, 170 Or 173, 180, 132 P2d 416 (1942) (providing that the conjunctive "and" and disjunctive "or" terms have been used with such laxity that courts have generally said the words are interchangeable and that one may be substituted for the other, if to do so is consistent with the legislative intent).

Likewise, the meaning of the word "shall" is not quite as fixed and immutable as plaintiffs suggest. We addressed a similar contention in *Friends of Columbia Gorge v. Columbia River (A133281)*, 218 Or App 261, 269-70, 179 P3d 700 (2008), a case in which—like this one—the petitioners insisted that the words "shall" and "may" can never be used interchangeably. We rejected that contention, explaining as follows:

> "We begin by observing that petitioners' argument is predicated on a false premise—the asserted 'diametrically different meanings of "may" and "shall." ' Of course, petitioners are correct that 'may' and 'shall' connote different things. *Compare Webster's Third New Int'l Dictionary* 1396 (unabridged ed 2002) (defining 'may' as, among other things, 'have the ability or competence * * * to have permission to'), *with id.* at 2085 (defining 'shall' as, among other things, 'will have to : must' (capitalization omitted)).

> "But it has long been recognized that the two terms, particularly as used in statutes, are not so distinct as their abstract definitions might otherwise suggest. The late Professor David Mellinkoff, for example, noted that

> > " '[t]he standard grammatical use of *may* (permitted) and *shall* (required) is also a legal use, often described as the 'presumed' use. But *may* and *shall* in legal writing, especially in statutes, are so frequently treated as

synonyms that the grammatical standard cannot be considered the legal standard. Context and interpretation so easily overwhelm either word.'

"David Mellinkoff, *Mellinkoff's Dictionary of American Legal Usage* 402-03 (1992). Bryan Garner similarly has observed that the use of the words 'may' and 'shall' is 'a horrific muddle.' Bryan A. Garner, *A Dictionary of Modern Legal Usage* 939 (2d ed 1995). As Garner explains, the word 'shall' is especially 'slippery,' being subject to at least eight different senses and sometimes shifting meaning in mid-sentence:

> " 'How can *shall* be so slippery, one may ask, when every lawyer knows that it denotes a mandatory action? Well, perhaps every lawyer has heard that it's mandatory, but very few consistently use it in that way. And, as a result, courts in virtually every English-speaking jurisdiction have held—by necessity—that *shall* means *may* in some contexts, and vice-versa.'

"*Id.* (emphases in original); *see also* ORS 174.100(4) ('may not' and 'shall not' are 'equivalent expressions of an absolute prohibition').

"The point is that the meanings of the words are not as concrete and immutable as petitioners suggest. Rather, their meanings depend on the manner in which they are employed in context."

That the people who enacted Article VIII, section 8(1), most likely intended the provision to be read as we have suggested is confirmed by the fact that the alternative reading would give no effect to the express language of the provision authorizing the legislature to issue a report explaining the "insufficiency" of its appropriations for public schools. If, as plaintiffs suggest, it is unlawful for the legislature to appropriate insufficient funds, then there would be no occasion to issue a report explaining an insufficiency. We are loath to read constitutional provisions to have such illusory effect. *State ex rel. Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954) (When possible, the court must give effect "to every part and every word of a Constitution and * * * unless there is some clear reason to the contrary, no portion of the fundamental law shall be treated as superfluous.").

Even assuming for the sake of argument that plaintiffs' construction of Article VIII, section 8(1), is at least plausible, the enactment history of the provision confirms that it is more likely that the voters intended the interpretation that the state has proposed.

The ballot title for Ballot Measure 1, included in the Voters' Pamphlet for the 2000 election, stated:

"**AMENDS CONSTITUTION: LEGISLATURE MUST FUND SCHOOL QUALITY GOALS ADEQUATELY; REPORT; ESTABLISH GRANTS.**

"**RESULT OF 'YES' VOTE:** 'Yes' vote requires legislature to fund school quality goals adequately; issue report; establish equalization grants.

"**RESULT OF 'NO' VOTE:** 'No' vote rejects requirements that legislature fund school quality goals adequately; issue report; establish grants.

"**SUMMARY:** Amends constitution. Current statutes establish quality goals for education; constitution does not require legislature to fund schools adequately to meet those goals. Measure requires that, in each biennium, legislature fund schools adequately to meet law's quality goals; publish report either demonstrating funding sufficiency or identifying reasons for insufficiency, its extent, and impact on state's ability to meet goals. Also requires establishing equalizing grant system to eligible districts whose voters approve local option taxes, consistent with any legal obligations to maintain substantial equity in state funding.

"**ESTIMATE OF FINANCIAL IMPACT:** There is no financial effect in state or local government expenditures or revenues."

Official Voters' Pamphlet, General Election, Nov 7, 2000 (boldface in original). Plaintiffs emphasize that the title, like the measure itself, uses mandatory language in setting forth the funding requirement. However, the summary's paraphrase of the measure describes the dual funding and reporting requirements, as well as the requirement that the legislature explain any insufficiency in funding. We note, as well, the estimate of "no financial effect," which suggests that the voters could not have understood that passage of the measure would mandate state expenditures.

The measure's explanatory statement, like the text of the provision, describes two requirements—funding and reporting:

> "Currently statutes establish quality goals for public education. The Oregon Constitution does not require the legislature to fund public education to meet these goals.

> "The measure requires the legislature to fund a sufficient amount of money to meet public education quality goals as established by the legislature. The measure also requires the legislature to publish a report that demonstrates to the public that the funding for public education is sufficient to meet the quality goals or must state the reasons for any insufficiency * * *[.]"

As does the provision itself, the explanatory statement implicitly and necessarily assumes the possibility of inadequate funding.

The official voters' pamphlet contained paid statements for and against Measure 1. Three of four arguments in favor of the measure emphasized the measure's requirement of accountability on the part of the legislature.[5] A single statement in opposition, provided by the Parents Education Association, asserted that "it's not government's job to educate children."

Newspaper editorials on the measure reflect the understanding that Measure 1 was a mandate for accountability, not funding. On October 8, 2000, one month before

---

[5] Statements were provided by the Oregon School Boards Association and the Confederation of Oregon School Administrators ("The Oregon Legislature is obligated to provide a public school system. It has also set in law ambitious student achievement standards. Unfortunately, its appropriations have not matched its ambitions. Measure 1 will correct that problem by directing the legislature to underwrite its educational goals or explain why not."); then-Governor John Kitzhaber ("The measure was crafted to change the debate about school funding from 'how much to spend?' to 'what education services are we buying?' It does so by requiring the legislature to fund schools so students can reach the high standards set in law. If the legislature fails to do so, its members must detail the effects of their funding decision on the ability of our students to meet standards."); and the Oregon Education Association ("By requiring the Legislature to provide adequate funding to meet Oregon's quality education goals, Measure 1 will hold the state accountable, just as schools are held accountable for using tax dollars wisely and well. Additionally, the measure requires the Legislature to report how their budget meets or fails to meet these goals—so that citizens **do** get the full story." (Emphasis in original.)).

the election, *The Oregonian* editorialized in support of the measure:

> "If the Legislature cannot or does not fully fund schools, the measure would require it to issue a public report explaining the shortfall and how it would affect student achievement. * * *

> "It's a thoughtful, well-intentioned proposal that would change for the better the infuriating biennial debate in the Legislature over public-school funding. But no one should be under any illusions that Measure 1 would resolve the issue. It requires a written excuse from the Legislature, not stable and adequate money for schools."

In recommending against the measure, on October 12, 2000, the Salem *Statesman Journal* wrote:

> "Kitzhaber's **Measure 1** is unnecessary and wouldn't help.

> "Gov. John Kitzhaber's school-finance initiative is a well-intentioned effort to improve public education. Recommending a no vote feels like campaigning against motherhood and apple pie. But that's what we're about to do.

> "A constitutional amendment isn't needed to convince most legislators that funding education adequately is their No. 1 job description. And passing this modest proposal may leave voters and lawmakers with the mistaken impression that they've solved the problem.

> "**Measure 1** requires the Legislature to provide enough money for Oregon's public schools to meet the academic goals set by a 1991 law. If they fail, they must tell voters why, and how public education will be affected."

(Boldface in original.)

On October 20, 2000, *The Eugene Register-Guard* explained the measure with this lead:

> "Measure 1 wouldn't raise a dime for Oregon schools, but its chief petitioner—Gov. John Kitzhaber—says it would bring a significant and necessary change to the way state lawmakers fund schools.

> "Under Measure 1, the state Legislature would have a choice each biennium: Give schools enough money to meet the goals of Oregon's decade-old education reform law, or

explain—in detail—why it won't and what effect the short-fall will have."

In urging a "yes" vote on the measure on October 12, 2000, the *Medford Mail Tribune* explained:

> "Measure 1 is not perfect, because the Legislature is given plenty of wiggle room to determine if it has met the funding goal or, if it determines the goal cannot be met, the Legislature can produce a report explaining why.
>
> "* * * * *
>
> "While the measure is largely toothless, it does require the Legislature to issue a report explaining how it met the standards or why it didn't meet the standards."

In sum, although a superficial reading of portions of the ballot title might be taken to support plaintiffs' proposed construction of Article VIII, section 8(1), an examination of the broader range of statements from the voters' pamphlet and contemporaneous editorials from newspapers with, collectively, statewide readership clarify that the ballot measure that became that constitutional provision was intended to set forth an aspirational goal of full funding for public education, but also to offer the legislature the option of providing less than full funding, along with an explanatory report.

■ We conclude that Article VIII, section 8(1), does not require the legislature to provide sufficient funding to meet the quality goals established by the QEC. We therefore affirm the trial court's dismissal of plaintiffs' complaint seeking declaratory relief.

Motion to determine jurisdiction allowed; claim for injunctive relief dismissed as moot; otherwise affirmed.