Argued and submitted May 15, reversed August 8, 2012

A. F.,
*Petitioner-Respondent,*

*v.*

OREGON DEPARTMENT OF HUMAN SERVICES,
by and through the
Child Protective Services Division,
*Respondent-Appellant.*

Multnomah County Circuit Court
100565295; A148861

284 P3d 1189

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

No appearance for respondent.

Before Armstrong, Presiding Judge, and Brewer, Judge, and Duncan, Judge.

BREWER, J.

**BREWER, J.**

The Department of Human Services (DHS) appeals from a trial court judgment that reversed DHS's administrative determination that mother had neglected her child based on the court's conclusion that DHS had failed to prove an "actual risk" of harm to the child.[1] We reverse.

On December 11, 2009, DHS received a report that mother's five-year-old child, T. R., had told school officials that his father "went loco" and "tried to stab him with a knife." T. R. also stated that his father was living with him and mother. DHS officials were aware that father had been designated as a predatory sex offender and was prohibited from having contact with minors as a condition of his parole. Moreover, they learned that, at the time of the report, father was in violation of the conditions of his parole and a warrant had been issued for his arrest.

A child protective services (CPS) worker for DHS interviewed T. R. at his school. T. R. stated that he lived at home with mother and father. He also talked about fighting and drug use in the home. Based on T. R.'s report and father's criminal history, the CPS worker obtained a protective custody order for T. R. from the juvenile court. The CPS worker and police officers then went to mother's home to execute the protective order. When they arrived, the officers observed that mother, T. R., and father were in the home. When the officers first approached, father fled to the garage and mother lied to the police, telling them that father was not in the home. Eventually, mother acknowledged that father was present when the officers informed her that they had seen him. The officers removed T. R. and then arrested father for violating conditions of his parole, including the condition that he not have contact with children.

DHS placed T. R. in foster care. DHS then conducted a further investigation of the December 11 report to determine whether there was reasonable cause to believe that mother

---

[1] Mother has not appeared on appeal. Even though this is a judicial review of an administrative order in which we ordinarily would refer to mother as "petitioner," we refer to her as "mother" because of the inextricable ties between this proceeding and the underlying juvenile dependency proceeding involving T. R.

had failed to protect T. R. from father by permitting father to live in the home. As amplified below, we briefly set out some of the information that DHS gathered in the investigation leading up to its administrative assessment. DHS had information that mother was aware of father's status as a predatory sex offender and felon and that she knew that father was prohibited from having contact with children as a condition of his parole. In 2006, and again in 2009, DHS had made administrative determinations of neglect against mother because she had allowed father to have contact with T. R. Despite those previous determinations of neglect, mother nonetheless had permitted father to live in her home with T. R. The CPS worker learned from father's parole officer that father had not complied with the conditions of his parole, that he had scored high on psychopathy testing, and that he had a history of eluding police. During an office visit after T. R. had been removed from her home, mother admitted that she knew that father was not permitted to have contact with T. R. and she stated that she now understood the risks. The CPS worker determined that the December 11 report of neglect was founded.

DHS then initiated a dependency proceeding under ORS chapter 419B. On January 11, 2010, the juvenile court held a jurisdictional hearing, and mother admitted by stipulation the following allegation in DHS's petition:

"The mother is aware that child's father is a convicted sex offender and felon, yet she has allowed the minor child to have contact with father, placing the child at risk of harm."

The court accepted mother's stipulation and found T. R. within its jurisdiction.

On January 26, 2010, based in part on mother's jurisdictional stipulation, DHS issued a final administrative order determining that the December 11, 2009, report of child neglect was founded, and it sent mother a letter informing her of that determination. On April 6, 2010, DHS denied mother's ensuing request for administrative review because the juvenile court had made a decision that was consistent with DHS's determination.

Mother then filed a petition for judicial review of DHS's order in the trial court. In support, mother argued that DHS's order was not supported by substantial evidence. The trial court held a hearing, and, thereafter, the court entered a judgment in which it found and concluded as follows:

"Findings of Fact:

"1. At the operative times at issue in this case, the father of petitioner's child had been designated as a predatory sex offender and was prohibited from having contact with children. However, this classification alone did not create an actual risk of harm to petitioner's child;

"2. Respondent DHS initially correctly determined that there was probable cause to believe that petitioner committed neglect by allowing her child to have contact with a known sex offender. However, the condition of not having contact with minors is standard for all convicted sex offenders and that condition alone, without evidence of risk of actual harm does not constitute or prove neglect. DHS should have performed further investigation after petitioner's child was removed from the home to determine whether or not there was any ongoing actual risk to the child based on father's classification as a sex offender.

"3. On January 11, 2010, petitioner stipulated in juvenile court that she knew father was designated as a predatory sex offender who was not to have contact with children and that allowing father to have contact with her child exposed the child to risk of harm. However, petitioner made this stipulation in an attempt to convince the juvenile court to return her son back into her care and petitioner was under the impression that this admission would allow her son to be returned home. As a result, I find that petitioner is not bound by the stipulation in this case on the issue of whether she exposed her child to a risk of harm.

"Conclusions of Law:

"1. DHS's January 26, 2010 founded disposition for neglect is not supported by substantial[ ] evidence in the record;

"2. Petitioner is not judicially estopped from asserting a position in this case that is contrary to her January 11, 2010 stipulation in juvenile court that she knew father was designated as a predatory sex offender who was not to have contact with children and that allowing father to have contact with her child exposed the child to risk of harm;

"3. In order to demonstrate neglect, DHS must demonstrate risk of actual harm to a child."

Based on those findings and conclusions, the court set aside DHS's order for "lack of substantial evidence." DHS appeals from that judgment, arguing that the trial court erred in so concluding.

The trial court reviewed DHS's order under ORS 183.484 as an order in other than a contested case. *Berger v. State Office for Services to Children and Families*, 195 Or App 587, 591, 98 P3d 1127 (2004). ORS 183.484(5)(c) provides that:

"The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

Our task on appeal is to initially determine whether the facts found by DHS in support of its administrative determination are supported by substantial evidence in the record and, then, to determine if those facts would permit a reasonable person to make the same determination that DHS made. *Powell v. Bunn*, 185 Or App 334, 338-39, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003).

"[O]n judicial review, a reviewing court is not to reweigh the evidence and make its own factual findings. * * * It is not to substitute its judgment for that of the agency as to which of two or more permissible inferences should be drawn."

*Deatherage v. Pernsteiner*, 239 Or App 161, 173, 243 P3d 865 (2010), *rev den*, 349 Or 664 (2011) (citations omitted). Instead, the question before the court "is limited to whether the evidence would permit a reasonable person to make the determination that the agency made in a particular case." *Id.* (citation omitted).

Because this court reviews very few administrative determinations such as the one that DHS made in this case, especially where a juvenile court earlier made a similar judicial determination involving the same child, we begin by briefly describing the nature of DHS's administrative determination and the context in which it was made. The

juvenile code provides that it is "the legislative policy of the State of Oregon to recognize county juvenile courts and departments as a basic foundation for the provision of services to children, wards, * * * and their families." ORS 419A.045. It is also the policy of Oregon for the state to offer "appropriate reunification services to parents * * * to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time." ORS 419B.090(5).

In accordance with those legislative policies, DHS must "complete a comprehensive family assessment of risk of abuse[,] * * * assess service needs[,]" and provide any "remedial services needed to ensure the safety of the child." ORS 409.185(2)(b), (c).[2] DHS's case planning and provision of remedial services must "bear a rational relationship to the jurisdictional findings that brought the ward within the court's jurisdiction." ORS 419B.343(1)(a). In effect, CPS's duty to provide remedial services to parents and children over whom the juvenile court has established jurisdiction under ORS 419B.100 is the complement to the right of the parents and children to receive services that, if successful, will lead to reunification of the family. *State ex rel SOSCF v. Imus*, 179 Or App 33, 39 P3d 213 (2002).

To implement its statutory assessment duties, DHS adopted OAR 413-015-1000, which provides, in part:

---

[2] ORS 409.185 provides, in pertinent part:

"(1) The Director of Human Services shall oversee the development of standards and procedures for assessment, investigation and enforcement of child protective services.

"* * * * *

"(2)(b) In all substantiated cases of child abuse and neglect, the role of the department is to complete a comprehensive family assessment of risk of abuse or neglect, or both, assess service needs and provide immediate protective services as necessary.

"(c) The department shall provide remedial services needed to ensure the safety of the child.

"* * * * *

"(h) In all cases of child abuse for which an investigation is conducted, the department shall provide a child's parent, guardian or caregiver with a clear written explanation of the investigation process, the court hearing process and the rights of the parent, guardian or caregiver in the abuse investigation and in the court proceedings related to the abuse investigation."

"(1) This rule describes child abuse and neglect for the purpose of making CPS assessment dispositions.

"(2) As part of completing the CPS assessment, the CPS worker must determine whether there is reasonable cause to believe child abuse or neglect occurred. The possible determinations are:

"(a) 'Founded,' which means there is reasonable cause to believe that child abuse or neglect occurred.

"(b) 'Unfounded,' which means no evidence of child abuse or neglect was identified or disclosed.

"(c) 'Unable to determine,' which means there are some indications of child abuse or neglect, but there is insufficient data to conclude that there is reasonable cause to believe that child abuse or neglect occurred.

"\* \* \* \* \*

"(3) When determining whether there is reasonable cause to believe child abuse or neglect occurred, the CPS worker shall consider, among others, the following parent or caregiver behavior, conditions, and circumstances:

"\* \* \* \* \*

"(d) Neglect, including failure, through action or omission, to provide and maintain adequate food, clothing, shelter, medical care, supervision, protection, or nurturing. Chronic neglect is a persistent pattern of family functioning in which the parent or caregiver does not sustain or meet the basic needs of a child resulting in an accumulation of harm that can have long term effect on the child's overall physical, mental, or emotional development. Neglect includes each of the following:

"\* \* \* \* \*

"(C) Lack of supervision and protection, including failure to provide supervision and protection appropriate to the child's age, mental ability, and physical condition.

"\* \* \* \* \*

"(h) Threat of harm, including all activities, conditions, and circumstances that place the child at threat of severe harm of physical abuse, sexual abuse, neglect, mental injury, or other child abuse or neglect."

Under those rules, an allegation of neglect is founded if there is reasonable cause to believe that a person has not appropriately protected a child from harm or that the person has exposed the child to a threat of severe harm of child abuse or neglect. In *Berger*, we reversed and remanded a trial court decision concluding that a parent's challenge to a DHS assessment required a contested case hearing. To the contrary, we concluded, contested case safeguards are not required in such circumstances. 195 Or App at 591. Our reasoning is instructive:

"Petitioner argues that he has a constitutional right to such a hearing because of the effect of the order on his reputation. However, [CPS] found only that there was reasonable cause to support the complaint, not that the complaint was true. The agency treats that finding as comparable to a finding of reasonable suspicion; it does not rise even to the level of probable cause. The effect of such a limited finding on petitioner's reputation would probably be limited. In addition, ORS 419B.035 restricts the dissemination of the agency's finding to law enforcement, certain persons involved in the juvenile justice system, the agency that certifies and regulates child care facilities, and for other limited purposes in accordance with agency rules. In making the finding, the agency decides only whether there is evidence that creates a reasonable suspicion of child abuse; it does not decide whether child abuse in fact occurred or even probably occurred. Thus, contrary evidence will have, at best, a limited effect on the issue that the agency must decide. On the other hand, providing a contested case hearing for every child abuse complaint would impose significant burdens on the agency, while the very low evidentiary threshold for deciding that a complaint is founded means that those hearings will seldom change the result. For those reasons, we conclude that petitioner does not have a constitutional right to a contested case hearing. After balancing the factors that the United States Supreme Court described in *Mathews v. Eldridge*, 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), we conclude that the benefit to petitioner of a contested case hearing would be limited and that the state's interests outweigh his interest in such a hearing."

*Id.* at 590-91.

In issuing a founded determination, DHS concludes only that there is reasonable cause to believe that child abuse or neglect occurred and, when known, that there is reasonable cause to believe that a specific person or persons was responsible for the child abuse or neglect. OAR 413-010-0705(5); OAR 413-010-0735(3)(d); OAR 413-010-0745(2). As we concluded in *Berger*, for purposes of such a determination, reasonable cause is equivalent to reasonable suspicion, a "very low evidentiary threshold for deciding that a complaint is founded." 195 Or App at 591. Thus, in issuing such a determination, DHS does not make an ultimate finding on the question whether a child is at risk of harm from abuse or neglect by a particular individual. That determination, ultimately, is for the court in a dependency proceeding. Rather, the agency was required to determine whether, under the circumstances before it, there was reasonable suspicion to believe that, by allowing T. R. to live with a predatory sex offender whose conditions of parole permitted him to have no contact with children, mother had placed T. R. at threat of severe harm of child abuse or neglect. In reviewing the agency's action, we confine ourselves to that question and, for the following reasons, answer it affirmatively.

First, mother's stipulation in the dependency jurisdictional hearing that father posed a risk to T. R. constituted a judicial admission. *State v. Porter*, 202 Or App 622, 626, 123 P3d 325 (2005) ("A stipulation is the functional equivalent of a judicial admission; indeed, the two terms are sometimes used interchangeably."). Once stipulated, a fact is conclusively proved, *State v. Ordonez-Villanueva*, 138 Or App 236, 244 n 8, 908 P2d 333 (1995), *rev den*, 322 Or 644 (1996), and can be withdrawn only for "fraud, mutual mistake, or the actual absence of consent." *Murray v. Johnson*, 86 Or App 295, 297, 738 P2d 1005 (1987). Nothing in the record suggests that mother's stipulation was the product of any such disqualifying inducement. Thus, mother's stipulation was a proper basis for DHS's administrative determination.[3]

---

[3] At oral argument, the court engaged in an extensive colloquy with DHS's attorney about the justiciability of this case. Among other things, the court expressed concern as to how this court's review of DHS's determination could have a practical effect on the parties in light of the juvenile court's preceding jurisdictional determination based on a similar finding of neglect. *See Hood*

Second, irrespective of mother's stipulation, the following facts that DHS gleaned from its investigation also furnished reasonable suspicion that mother had placed T. R. at threat of severe harm of child abuse or neglect. As noted, T. R. reported that his father had behaved erratically and had tried to stab him with a knife. DHS noted that it had previously informed mother that father was not to have contact with T. R. until it was "determined by parole and probation" that he would not be a threat to children. At the time of the report, there was a warrant for father's arrest for failure to abide by the conditions of his parole. The CPS worker also learned from father's parole officer that father had not complied with the conditions of his parole, that he had scored high on psychopathy testing, and that he had a history of eluding police.

Because of father's history with law enforcement, multiple officers assisted the CPS worker when she responded to petitioner's home. Father disappeared into the garage when officers knocked on the door. When mother answered the door, she denied that father was there. When confronted with the truth about father's presence, mother asserted that she believed that father was in compliance with his parole conditions and could be around her son. The CPS worker had been informed, however, that father's parole officer had told mother a week earlier that a warrant had been issued for father's arrest for noncompliance with the conditions of his parole. Mother later admitted that she knew that father was not supposed to be around her son. When asked about father's need for sex-offender treatment, his parole officer stated that a clinical coordinator had

*River County v. Stevenson*, 177 Or App 78, 81, 33 P3d 325 (2001) (jurisdictional issues need not be raised by the parties, because the court has the obligation to consider them *sua sponte*). An issue becomes moot where "the court's exercise of authority would no longer have a 'practical effect' on the rights of the parties to the controversy." *Pendleton School Dist. v. State of Oregon*, 220 Or App 56, 66, 185 P3d 471 (2008), *aff'd in part, rev'd in part*, 345 Or 596, 200 P3d 133 (2009) (citing *Yancy v. Shatzer*, 337 Or 345, 349, 97 P3d 1161 (2004)). Suffice it to say that, despite that concern, we recognize that DHS's case planning and remedial obligations continue after the jurisdictional order that the juvenile court entered, and DHS has an interest in being able to fulfill those statutory obligations in a way that is consistent with mother's stipulation and the trial court's jurisdictional order. Because the trial court's order under review arguably obstructs DHS's performance of its obligations in a way that is inconsistent with the juvenile court's jurisdictional order, we conclude that a decision on review will have the requisite practical effect in this case.

concluded that father is not amenable to sex-offender treatment because of longstanding personality disorders. The CPS worker also learned that father had been sentenced to 60 days' incarceration for his parole violations.

Under those circumstances, DHS properly determined that that there was reasonable suspicion to believe that, by allowing father to reside in her home with T. R., mother had placed T. R. at threat of severe harm of child abuse or neglect. It follows that DHS had reasonable cause to believe that child neglect had occurred and that the trial court erred in setting aside the agency's determination of neglect.

Reversed.